**WORTHINGTON v. UNITED STATES.**

No. 10288.

Circuit Court of Appeals, Sixth Circuit.

Feb. 13, 1948.

Walter Martin, of Saginaw, Mich. (Walter Martin, of Saginaw, Mich., of counsel; Harvey E. Van Benschoten, of Saginaw, Mich., on the brief), for appellant.

Janet E. Kinnane, of Bay City, Mich., (John C. Lehr, of Detroit, Mich., and Janet E. Kinnane, of Bay City, Mich., on the brief), for appellee.

Before MARTIN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

On February 25, 1946, about 8:00 at night, four officers drove up to the home of Belle Worthington, appellant, in the city of Saginaw, Michigan. Two of the officers, in plain clothes, were members of the Federal Bureau of Narcotics; the other two were uniformed members of the Saginaw Police Department. They knocked at the front door, and when appellant opened it, one of the officers placed her under arrest. They ordered her to sit in a chair in the living room, and, during the next four hours, they ransacked the house, going through every room and searching all of appellant's articles of apparel, suitcases, trunks, beds, and other furniture.

About midnight, they came upon a small bottle on her bedroom dresser holding six capsules and five tablets. The capsules contained 18.51 grains of codein sulphate, a derivative of opium; the tablets contained no narcotic drugs. Later, the officers found six vials in a small black purse on a shelf of groceries in a storeroom. Each vial contained 20 tablets and each tablet consisted of lactose and $\frac{1}{4}$ grain of morphine sulphate, a derivative of opium. They then secured her car keys from her and searched her automobile which was parked in front of her house. There they found a bottle in the glove compartment which contained a solution of morphine. The

officers at no time had any warrant for the arrest of appellant, or any warrant to search her home.

Appellant was indicted on three counts, based upon each of the substances found in the search, and charging that she had unlawfully purchased the said derivatives of opium, "not being in or from the original stamped package and not having on them the appropriate taxpaid United States Internal Revenue Stamps as required by Section 2553(a) of the Internal Revenue Code." Title 26 U.S.C.A. Int.Rev.Code, § 2553. It may be observed that unexplained possession of narcotics justifies a charge of unlawful purchase.

A plea of not guilty was entered, and appellant's counsel moved that the capsules, tablets, and solution seized by the officers, upon which the indictment was found, be excluded from evidence upon the trial of the case, and be suppressed upon the ground that they were obtained as a result of the unlawful arrest of her person, without warrant, in violation of her constitutional rights against unreasonable arrest and seizure of her person; and that such evidence was also obtained through an illegal search of appellant's private home without a search warrant, in violation of her constitutional guaranty against unreasonable search and seizure. Prior to trial, the district court denied the motion to suppress.

On the trial of the case, counsel for appellant, during the course of the proceedings, renewed, on numerous occasions, the motion to suppress the evidence. The district court, however, permitted the government to introduce evidence to sustain its contention that the arrest of appellant and the search of her premises were made with reasonable cause to believe that a felony was being committed. Before the case was submitted to the jury the district court, finding that the evidence upon which the officers acted was undisputed, concluded that the determination whether the arresting officers acted upon probable cause was a matter of law for the court to determine, and held that there was such probable cause; that the arrest of appellant and the search of her premises were, therefore, not in violation of the constitutional provisions

against illegal arrest and search and seizure; and that the evidence so secured was properly admissible against appellant. After being duly instructed, the jury considered the case and returned a verdict of guilty, on two counts, and not guilty on one count. The district court sentenced appellant to the payment of a fine and a prison term.

The issue on appeal is whether the officers had probable cause to believe that appellant was committing a felony, and whether the arrest of her person and search of the premises were in accordance with law. If they did not have probable cause for arrest, the evidence obtained as a result of the search should have been suppressed. It is admitted that without this evidence, appellant could not have been convicted.

The evidence upon which the government relies for its showing of probable cause appears in the following somewhat detailed account of the circumstances leading up to the arrest of appellant.

Shortly after noon on February 25, 1946, Agent Newey, of the Federal Bureau of Narcotics, received a telephone call in the bureau office in Detroit from a man who refused to give his name. This unidentified caller stated that he wanted to trade a "tip" for some information from the bureau. He first asked Newey whether he knew a man by the name of McCarthy, who had been arrested in Eaton Rapids, Michigan, and was then being held at Grand Rapids. Newey did have information that McCarthy had been arrested through the efforts of Agent Richards, of the Federal Bureau of Narcotics, but told the unidentified caller that he did not know anything about the matter. Newey was then asked if he knew Abe Epstein, but replied that he did not, although, actually, he had heard from prior conversations at the office with other agents of the Narcotic Bureau, that Abe Epstein was a well-known violator of the Federal Narcotics law. The caller then told Newey that he had some "hot" information; that the narcotics ring, consisting of "McCarthy and McNiff, and the rest of them" which had been operating in Michigan, was headed by Abe Epstein and his companion, Belle Worthington, appellant herein; that Abe

Epstein had previously been arrested and convicted for a violation of the Federal Narcotics Law, as well as for a violation of a similar Michigan law, and that Epstein had not, at that time, finished service of the probationary period which had been a part of the sentence of the court; that if Newey would go to Saginaw, he could find narcotics that the unidentified caller had seen in a storeroom and safe in appellant's home; and he further remarked that appellant had operated a "sporting house" in the red light district on South Water Street in Saginaw. The caller used many terms known in criminal parlance, which convinced Newey that the man was an underworld character.

With the information imparted to him by the anonymous telephone call, Agent Newey, together with Agent Richards, proceeded "to corroborate the information and seek its verification" in the files of the office of the Federal Narcotics Bureau in Detroit. In these files, they found a record of an investigation of narcotics violations which had been carried on for some years previously by Agent Rudd.

The record in the files of the bureau disclosed that, in 1944, Rudd, in the course of his inquiries, had come across the information that Abe Epstein had been arrested on September 13, 1943, in Bay City, Michigan, for a violation of the Michigan narcotics law, and that, at the time of his arrest, he had been operating appellant's automobile. Further inquiry revealed that Epstein had obtained a number of false prescriptions from doctors in Bay City and, by the use of them, had secured drugs from several pharmacists in that city.

Rudd, a witness on the trial, testified about the record he had prepared in the case and stated that he had received a letter from his district supervisor in Chicago with a list of telephone numbers to investigate during a trip he was making to northern Michigan. He stated that the letter, dated October 31, 1945, was to the effect that Max Kornhauser, known to Rudd as a narcotic peddler who had previously been convicted for violation of the law, had "in some manner" been in communication with Epstein at a Detroit telephone number and with some person at a certain Saginaw telephone number. Rudd learned

that the Detroit telephone number was that of Epstein's sister, with whom he lived. He already knew that Kornhauser was an acquaintance of Epstein. When Rudd came to Saginaw on November 14, 1945, he ascertained that the Saginaw phone number in question was registered to the address of 418 South Water Street, the name of the subscriber being listed as that of appellant. The Kornhauser matter may be summed up by observing that a narcotic peddler was found to have been telephoning someone at Epstein's home, as well as someone at appellant's house on South Water Street.

Rudd testified that he spent several hours that day, November 14th, observing the premises on South Water Street, and at about 10:00 at night, he saw a man come out of the house and enter a "1938 black panel Ford truck," an old car "which had produce in it." Some weeks later, Rudd was directed to investigate a robbery of the entire stock of narcotics of a drug store in Standish, Michigan, on December 5, 1945. He said that he found that a man, who answered the description of the one he had seen coming out of the South Water Street house in Saginaw, had been in the drug store in Standish on the day it was robbed; that this man had gone to see Doctor Douglas, of Standish, on the same day; that he had told the doctor he was in need of morphine; and he offered to trade a bushel of apples for a morphine prescription. "The doctor gave me a description of the truck," Rudd testified, and "so did the druggist, and I knew, felt certain in my mind that man driving that truck was the same man who I had seen at 418 South Water Street." Rudd then learned that the man who had talked to Doctor Douglas had given his name as James McNiff, and related that one of the other federal agents some time previously was searching for a man named James McNiff as a person who had passed false narcotic prescriptions in Detroit and had given his address as 65 Sproat Street, the same address that Epstein had given for similar purposes in 1944. Rudd further found that McNiff had been arrested by the sheriff of Grand Haven, Michigan, while driving a truck bearing produce, for violation of the narcotics law. Rudd said that he then knew "from the

description of the man as given on the fingerprint card, which came through from the Sheriff's office, that it was the same man who I had seen outside, coming out of 418 South Water Street, and fitted identically the truck and description of the man of whom I had been told about at Standish." Upon a further investigation in Detroit, Rudd stated that he had found that "James McNiff was an associate and constant companion of one James McCarthy, also known in our office as McNiff." Briefly, the purport of the foregoing, which was set forth in the written record that Newey referred to when he received the anonymous telephone call, is that a man was seen in Saginaw leaving appellant's disorderly house and that about three weeks later, another man allegedly resembling him was reported seen in a drug store in Standish, and was asking a doctor, in that city, for morphine, on the day that the store in question was robbed of its stock of narcotics; and, further, that this man was later arrested for violation of the narcotics law and was also an associate of one McCarthy who had been similarly arrested at a different time for violation of the same law.

There was also proof that a girl from the house on South Water Street had been arrested on a narcotic charge in 1940, six years before appellant's arrest. There is no dispute that appellant was absent at the time, in the South; that the girl had come to the house after appellant had left the state and while it was in charge of another person, and that the girl in question was in the county jail when appellant returned to Saginaw. Appellant testified that she had never seen the girl, and there is nothing to contradict her statement or raise any suspicion that it is not true.

With this outline of the evidence upon which the arrest and search were sought to be justified, we come to the constitutional question in this case. We are here concerned with the Fourth Amendment, which, in part, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and partic- ularly describing the place to be searched, and the persons or things to be seized."

The effect, nature, and extent of the Amendment, as well as the duties of courts to secure to people of all conditions the protection therein given and guaranteed, is set forth in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 344, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177, in which it is said:

"The effect of the 4th Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations, and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects against all unreasonable searches and seizures under the guise of law. *This protection reaches all alike, whether accused of crime or not,* and the duty of giving to it force and effect is obligatory upon all intrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures * * * should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." (Emphasis supplied.)

In Go-Bart Co. v. United States, 282 U.S. 344, 356, 51 S.Ct. 153, 158, 75 L.Ed. 374, the court said:

"The first clause of the Fourth Amendment declares: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' It is general and forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made and the papers taken. Gouled v. United States, 255 U.S. 298, 307, 41 S.Ct. 261, 65 L.Ed. 647. The second clause declares: 'And no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

seized.' This prevents the issue of warrants on loose, vague or doubtful bases of fact. It emphasizes the purpose to protect against all general searches. Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409. The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746. Weeks v. United States, supra, pages 389–392 of 232 U.S., 34 S.Ct. 341."

The Fourth Amendment guarantees the right of the individual to be secure against unreasonable arrests as well as against unreasonable search of houses and seizure of papers and effects. See United States ex rel. Potts v. Rabb, 3 Cir., 141 F.2d 45. Its protection extends to all equally —to those justly suspected and accused as well as the innocent; to offenders, as well as to the law abiding. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775.

But the Amendment does not denounce all searches and seizures, but only those that are unreasonable. Carroll v. United States, 267 U.S. 132, 133, 147, 45 S.Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790. An arrest may be made, without a warrant, for a felony, although its commission was not in the presence of the arresting officer, provided the officer had probable cause to believe that the person arrested had committed the felony. Probable cause for arrest depends upon the particular facts known to the arresting officer, before or at the time of the arrest, and such an arrest must be upheld in case the facts are sufficient, in the opinion of the court, to establish such probable cause. Wisniewski v. United States, 6 Cir., 47 F.2d 825. If the information at the disposal of an arresting officer is wholly insufficient to justify the issuance of a warrant for arrest, an arrest in such a case with an invalid warrant, or with no warrant at all, would be an illegal arrest.

All of what is here said with respect to arrests applies to searches and seizures. Any search of a private dwelling without a search warrant is unreasonable, and this is all the more clear where the information in the possession of the searching officer is insufficient to justify the issuance of a search warrant. That which could be done with the only kind of a search warrant that could be obtained—and invalid one—should not be permitted without any search warrant at all. Wakkuri v. United States, 6 Cir., 67 F.2d 844, 845. The search of a private dwelling without a warrant is, in itself, unreasonable and abhorrent to our laws. Belief, however, well founded, that an article sought, is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant, and such searches are held unlawful notwithstanding facts unquestionably showing probable cause. Agnello v. United States, supra, pages 20, 32, 33 of 269 U.S., 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409.

Of course, in case of a lawful arrest, officers may search that part of the premises over which the offender's control, and unlawful activities, likely extended; and may seize things used to carry on the criminal enterprise and the means by which it was committed. United States v. Lindenfeld, 2 Cir., 142 F.2d 829, certiorari denied, 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609. See Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098.

The issue in the instant case is whether the arrest of appellant was a lawful arrest. Unless it were a lawful arrest, the officers had no right to search the premises. If they had no right to search the premises, the evidence found as a result of the search must be suppressed. It is admitted that without such evidence, the government would have had no case against appellant.

With these preliminary observations, we come to the question whether the arrest of appellant was lawful, or whether it was in violation of her constitutional rights. In Dumbra v. United States, 268 U.S. 435,

441, 45 S.Ct. 546, 548, 69 L.Ed. 1032, the court said:

" 'Probable cause' has been defined by this court as 'reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged.' Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035.

"In determining what is probable cause, we are not called upon to determine whether the offense charged has in fact been committed. We are concerned only with the question whether the affiant had reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched, and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant."

In United States ex rel. King v. Gokey, D. C., 32 F.2d 793, 794, the court said:

"The commission of a crime must be shown by facts positively stated before a commissioner has jurisdiction to issue a warrant of arrest. This protection is guaranteed to every person by the Constitution (Fourth Amendment) through the provision that 'no warrant shall issue, but upon probable cause, supported by oath or affirmation.' This safeguard of liberty has been jealously protected by all courts. And well it should be, for it would be intolerable to allow a warrant of arrest to be issued upon the opinion, conclusion, or suspicion of some person, unsupported by facts. The 'oath or affirmation' required is of facts, not opinions or conclusions. The complaint must be supported by proof, so that the magistrate may exercise his judgment or discretion in determining that an offense has been committed, and that there is probable cause to believe the accused guilty of the commission thereof. If the complaint is made on information and belief, it must give the grounds of belief and sources of information. A complaint not based upon the complainant's personal knowledge, and unsupported by other proof, confers no jurisdiction upon the commissioner to issue

a warrant. U. S. v. Baumert, D.C., 179 F. 735; U. S. v. Wells, D.C., 225 F. 320; U. S. v. Ruroede, D.C., 220 F. 210; In re Blum, 9 Misc. 571, 30 N.Y.S. 396."

Was there probable cause for appellant's arrest? In its contention that the arrest of appellant was lawful, that the search allegedly incidental to the arrest was proper, and that, therefore, neither the arrest nor the search offended against the constitutional provision prohibiting unreasonable searches and seizures, but was made upon probable cause, the government relies upon the statement of law in Carroll v. United States, supra, page 132 of 267 U.S., 45 S. Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790, in which it is said:

"The necessity for probable cause in justifying seizures on land or sea, in making arrests without warrant for past felonies, and in malicious prosecution and false imprisonment cases has led to frequent definition of the phrase. In Stacey v. Emery, 97 U.S. 642, 645, (24 L.Ed. 1035), a suit for damages for seizure by a collector, this court defined probable cause as follows:

" 'If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient.' See Locke v. United States, 7 Cranch 339, 3 L.Ed. 364; The George, Fed.Cas.No.5,328, 1 Mason 24; The Thompson, 3 Wall. 155, 18 L.Ed. 55. It was laid down by Chief Justice Shaw, in Commonwealth v. Carey, 12 Cush. 246, 251 that: 'If a constable or other peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful.' Commonwealth v. Phelps, 209 Mass. 396, 95 N.E. 868, Ann. Cas.1912B, 566; Rohan v. Sawin, 5 Cush. 281, 285. In McCarthy v. De Armit, 99 Pa. 63, the Supreme Court of Pennsylvania sums up the definition of probable cause in this way (page 69):

" 'The substance of all the definitions is a reasonable ground for belief in guilt.' "

It is declared by counsel for the government that the foregoing lays down the rule that if an officer suspects a person, on facts communicated to him by others, that he may thereupon have reasonable ground to believe that the accused has been guilty of a felony, and may lawfully arrest him and search his premises, without a warrant for arrest or a search warrant. It may be that this is a reasonable inference to be drawn from the language used; but, immediately continuing after the above excerpt, the court stated that the good faith of the officer is not enough to constitute probable cause, but that such faith must be grounded on *facts within the knowledge of the party making the arrest,* which, in the judgment of the court, would make his faith reasonable, citing Director General v. Kastenbaum, 263 U.S. 25, 44 S.Ct. 52, 53, 68 L.Ed. 146. In that case, it was declared:

"The want of probable cause, certainly in the absence of proof of guilt or conviction of the plaintiff, is measured by the state of the defendant's knowledge, not by his intent. It means the absence of probable cause known to the defendant when he instituted the suit. But the standard applied to defendant's consciousness is external to it. The question is not whether he thought the facts to constitute probable cause, but whether the court thinks they did. Holmes on the Common Law, 140. Probable cause is a mixed question of law and fact. The court submits the evidence of it to the jury, with instructions as to what facts will amount to probable cause if proved. Stewart v. Sonneborn, 98 U.S. 187, 194, 25 L. Ed. 116; Pollock on Torts (8th Ed.) p. 225; 1 Cooley on Torts, (3d Ed.) p. 321. Counsel for petitioner contends that in an action against the sovereign government, it must be conclusively presumed that good faith existed upon its part so far as it is responsible for the arrest, and therefore that a complete defense of probable cause on its part is always made out. But, as we have seen, good faith is not enough to constitute probable cause. That faith must be grounded on facts within knowledge of the Director General's agent, which in the judgment of the court would make his faith reasonable."

What kind of facts should the officer have knowledge of to justify arrest on probable cause? Is knowledge of facts of a hearsay nature sufficient, or only evidence which would be competent on the trial of the offense?

■ Many decisions have left the answer obscure, but any uncertainty in the matter was finally resolved in Grau v. United States, 287 U.S. 124, 53 S.Ct. 38, 40, 77 L.Ed. 212, in which the court, speaking through Mr. Justice Roberts, in an opinion of conciseness and clarity, laid down the rule:

"A search warrant may issue only upon evidence which would be competent in the trial of the offense before a jury (Giles v. United States, 1 Cir., 284 F. 208; Wagner v. United States, 8 Cir., 8 F.2d 581); and would lead a man of prudence and caution to believe that the offense has been committed. (Steele v. United States, 267 U.S. 498, 504, 45 S.Ct. 414, 69 L.Ed. 757.)"*

■■ What is set forth as the requirement for evidence to justify the issuance of a search warrant, applies equally to a warrant for arrest; and neither search warrant nor an arrest with or without warrant can be made in any case without personal knowledge on the part of the official making application for a warrant, or the officer making the arrest without a warrant, of facts that would be competent in the trial of the offense before a jury. It is unnecessary to buttress the opinion of the Supreme Court in the Grau case with the authority of prior adjudications. But many outstanding courts had, on different facts, announced somewhat the same rule previously. In Giles v. United States, 1 Cir., 284 F. 208, which was cited in the Grau case, the Circuit Court of Appeals had occasion to discuss the prohibition of the Fourth Amendment against unreasonable searches and seizures, and observed that a process which would authorize an official at any time of the day or night to enter the home or office of any person, breaking doors, windows, and opening by force anything in

---

1 See 46 Harvard Law Review 1307, for adverse critical comment.

the premises for the purpose of taking possession of articles belonging to the occupant or falling into the category of outlawed property, "is a power capable of such oppressive and liberty destroying use that it should be strictly guarded and exercised." The court referred to Archbold's Criminal Practice and Pleading, in which it is said:

"The proceedings upon search warrants should be strictly legal, for there is not a description of process known to the law, the execution of which is more distressing to the citizen. Perhaps there is none which excites such intense feeling in consequence of its humiliating and degrading effects."

It was further said that when a commissioner had presented to him affidavits or evidence of the violation of a criminal statute, accompanied by a request for a search warrant, such a commissioner acts in a judicial capacity, and should issue such warrant only upon competent evidence such as would be admissible upon the trial of a case before a jury; and that the finding of probable cause for the issuance of a search warrant is one exclusively for the court or commissioner having the matter in charge. In holding unlawful the warrant issued in the Giles case, the court declared it should have affirmatively appeared from the affidavit for the warrant that was there issued, that the affiant had personal knowledge of facts competent for a jury to consider, and the facts, and not his conclusion from the facts, should have been before the commissioner. For lack of such personal knowledge, the warrant was held unlawful. In Simmons v. United States, 8 Cir., 18 F.2d 85, 88, the court said:

"It is well established by the authorities that the affidavit for a search warrant must affirm facts, and not merely express beliefs or suspicions, and that these facts must be made by one having personal knowledge. A mere belief of the affiant is not sufficient basis for the warrant. It is not necessary that the evidence submitted be sufficient to convict, yet it must be such as would be admissible before a jury."

See also Brown v. United States, 9 Cir., 4 F.2d 246; Wagner v. United States, 8 Cir., 8 F.2d 581, 585; Baumboy v. United States, 9 Cir., 24 F.2d 512; Hershkowitz v. United States, 6 Cir., 65 F.2d 920; Reeve v. Howe, D.C., 33 F.Supp. 619.

The facts necessary to uphold an arrest without a warrant must be sufficiently strong to support the issuance of a warrant for arrest. In no case may an arrest or a warrant for arrest be based upon opinion or suspicion of some person unsupported by personal knowledge of facts, United States ex rel. King v. Gokey, supra; and in no case may a warrant to search a private home rest upon mere affirmance of suspicion or belief without disclosure of supporting facts and circumstances. Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159.

None of the arresting officers—nor all of them together—had personal knowledge of sufficient evidence of probable cause to arrest appellant, that would have been admissible before a jury on a trial for the offense. The anonymous telephone conversation would not have been admissible. Rudd, the federal narcotics officer, could not have testified with respect to the description given to him by other persons of the man and the truck at Standish on the day of the robbery of the stock of narcotics from the drug store in that city; and could not have testified that the man and the truck so described were identical to the man and truck he had seen some months before at the house on South Water Street. This would all have been hearsay—and poor hearsay at that, since the record of the trial discloses that Rudd testified that he "did not pay any attention to that truck or the man" when he saw them. An arrest and search on such flimsy pretext of evidence is in violation of the law. Furthermore, Rudd did not make the arrest nor was he present at the time. He was out of the state when the arrest of appellant was first considered, and also when it was actually made. All this information from Rudd was found in a file in the office of the bureau in Detroit. An arrest and search without a warrant cannot be justified by an officer on information which he finds in a file which has been made up by someone else. He must have personal knowledge of facts showing probable cause.

All of the evidence of telephone calls testified to was hearsay, and, in any event, none was ever proved to have been traced to appellant's home even by hearsay evidence.

The girl who was arrested for violation of the narcotics law six years before the arrest of appellant, did not reside at appellant's home but at the house on South Water Street. It is a notorious fact that such girls are commonly drug addicts. This evidence, however, was not inadmissible on the ground of hearsay, nor was the evidence of the fact that Epstein, the narcotic law violator, was arrested while driving appellant's car two and a half years before appellant's arrest. But the incident of the girl's arrest, and that of Epstein, was so remote in time from appellant's arrest and of such little weight in connecting her with violation of the narcotic law that, without other admissible evidence, it did not constitute probable cause for the arrest of appellant. This is not only the reasonable conclusion to be drawn, but the actual fact, emphasized by the circumstance that there was never, at any time, on the part of any law enforcement officers, state or federal, any suspicion that appellant ever sold narcotic drugs or had them in her possession, or was in any way connected, directly or indirectly, with narcotic law violations—until the anonymous telephone call. She had not only never been suspected, but, in spite of the so-called evidence in the file, her home had never been placed under observation. In fact, the narcotics officers did not even know where her home was located until they were taken there to make the arrest.

In this case, the officers assumed that some denizen of the criminal world was betraying appellant. They did not know who the enemy was, but they decided they would act on the anonymous information given, and that they would arrest appellant and search her home. If they found nothing, it was probably assumed that appellant did not have enough standing in her community to question their unlawful conduct.

Another circumstance bears upon the character of the search made in this case. The federal agents had told the local police, before they approached appellant's home, "that we were looking for some narcotics that were to be in the safe or in the storeroom of that house." They were told "where we anticipated searching for the narcotics." In Henderson v. United States, 4 Cir., 12 F.2d 528, 51 A.L.R. 420, in a case similar to that before us, the court said:

"It is admitted that the government officers had no warrant either for the arrest of the defendant or for the search of his premises. There is no showing or contention that it was necessary to arrest defendant without a warrant to prevent his escape, and a careful consideration of the evidence leads irresistibly to the conclusion that the search of his dwelling was made, not as an incident of the arrest, but as the chief object which the officers had in view in entering upon his premises. Instead of the search being incidental to the arrest, therefore, the arrest was incidental to if not a mere pretext for the search. The question is whether a search made under such circumstances violates the constitutional rights of the defendant. We think that it does." Page 528 of 12 F.2d.

"And when it appears, as it does here, that the search and not the arrest was the real object of the officers in entering upon the premises, and that the arrest was a pretext for or at the most an incident of the search, ought such search be upheld as a reasonable one within the meaning of the Constitution? Manifestly not." Page 531 of 12 F.2d.

Moreover, even when a lawful arrest was made with a warrant, the Supreme Court held that a search, under the circumstances of that case, was unlawful and warned: "An arrest may not be used as a pretext to search for evidence." United States v. Lefkowitz, supra, page 467 of 285 U.S., page 424 of 52 S.Ct., 76 L.Ed. 877, 82 A.L.R. 775.

In the case before us, all the circumstances disclose that the arrest was made as a pretext to search for evidence, and on that ground alone, the evidence should have been suppressed. The government argues that a so-called confession was properly admitted in evidence. This alleged confession, made after the arrest and search, and while appellant was in custody, cannot serve to make that legal which, in its

inception, was illegal. United States v. Setaro, D.C., 37 F.2d 134. In Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F. 2d 690, 694, Mr. Justice Vinson, now Chief Justice of the United States, speaking for the court, said:

"It has been held that a confession does not make good a search illegal at its inception. This is a part of the broader rule that an illegal search cannot be legalized by what it brings to light. That rule should not be narrowed even though an admission or confession is obtained. Officers should not be encouraged to proceed in an irregular manner on the chance that all will end well."

See also Harris v. United States, supra, at page 153 of 331 U.S., 67 S.Ct. 1102.

In this case, the federal officer received the anonymous telephone call a little after noon on February 25, 1946. He was required, by rule of the department, before going to Saginaw, to receive authority from the main office in Washington. He did not receive such authority until about 4:30 in the afternoon. There was, therefore, a period of four and a half hours between receiving the anonymous telephone call and the officer's departure from the narcotic bureau for Saginaw. The office of the United States Commissioner was in the same building as the narcotic bureau. The officer who directed the arrest and search in this case testified that between the time he received the anonymous telephone call and his departure for Saginaw, he could have gone to the United States Commissioner's office to secure a warrant, "more than a hundred times." He stated that he knew that to secure a warrant for appellant's arrest, he would have to swear to it on his own personal knowledge before the Commissioner. He further testified that he had worked as a narcotics agent, making numerous arrests during a period of the preceding three years, and during that entire time, he had "always managed to arrest without a warrant for arrest or without a search warrant."

In Taylor v. United States, 286 U.S. 1, 6, 52 S.Ct. 466, 467, 76 L.Ed. 951, the court said:

"Although over a considerable period numerous complaints concerning the use of these premises had been received, the agents had made no effort to obtain a warrant for making a search. They had abundant opportunity so to do and to proceed in an orderly way even after the odor had emphasized their suspicions; there was no probability of material change in the situation during the time necessary to secure such warrant. Moreover, a short period of watching would have prevented any such possibility.

"We think, in any view, the action of the agents was inexcusable and the seizure unreasonable. The evidence was obtained unlawfully and should have been suppressed."

In holding that an arrest without a warrant and a search allegedly incidental thereto was unlawful, Judge Learned Hand, speaking for the court, in United States v. Kaplan, 2 Cir., 89 F.2d 869 said:

"We are told that unless such evidence will serve, it will be impossible to suppress an evil of large proportion in the residential part of Brooklyn. Perhaps so; any community must choose between the impairment of its power to punish crime and such evils as arise from its uncontrolled prosecution. But the danger is not certain, for the officers could have applied for a warrant which —as was at least intimated in Taylor v. United States—might then have been valid. It takes time to break up a still and take the parts away; if the attempt were made, it would discover itself immediately. One or more officers could have watched, while the others went to a judge or commissioner, whose action would at least have put a different face upon their subsequent proceedings." Page 871 of 89 F.2d

See also Dennert v. United States, 6 Cir., 147 F.2d 286, and Roberson v. United States, 6 Cir., 165 F.2d 752 decided January 19, 1948.

While the foregoing cases were concerned with search warrants rather than warrants for arrest, both are within the ambit of the Fourth Amendment. The arrest and search made without a warrant in this case was unreasonable and unlawful in violation of appellant's constitutional rights, and on that ground alone, the evidence seized during the search should have been suppressed.

It may be here pertinent to remark upon a significant incident in the case. After the officers arrested appellant and searched her premises, they claim that they asked her for permission to take her automobile keys and search her car which was parked in front of her home. They testified that appellant gave her keys to them voluntarily and permitted them to search her car. It was in the car that the bottle of solution was found, upon which count 3 of the indictment was based. Appellant denied that she had given the officers permission to search the car, and insisted that she surrendered her keys only upon the demand of the officers. The district court left it to the jury to say which party was telling the truth, and directed that if the jury found that appellant had not consented to the search of her car, it would find her not guilty on count 3. On this question—practically the only substantial question of fact submitted to the jury or, at least, virtually the only one in which the testimony of the officers was in direct conflict with appellant, the members of the jury found appellant not guilty. They may have concluded that the officers were testifying falsely; or they may have felt, instinctively, that the conduct of the officers in the arrest of appellant and the search of her home violated the cherished safeguards upon which the rights of all of our citizens are founded.

The Fourth Amendment does not exclude from its protection a woman of the underworld. Police officers can no more violate her rights under the Constitution than they can violate those of any other person. We have heard enough in these last years, throughout the world, of the knock on the door in the nighttime, the arrest, the ransacking search, and the prison cell, to take warning. The constitutional rights of everyone are immediately imperiled when the rights, of even the outcast, the disdained, and the powerless, are trampled over with impunity. Violation of the safeguards, guaranteed by the Bill of Rights, is not to be trifled with, or lightly considered, no matter who the victim be. Such abuse must be struck down, without palliation, in its beginning.

Since the evidence which was secured as a result of the search of appellant's home was the only evidence supporting the conviction, and should have been suppressed, the case must be dismissed, and appellant discharged. The judgment of the district court is, accordingly, reversed, the conviction of appellant is set aside, and the case remanded for entry of a judgment in accordance with this opinion.