**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Robert LASSOFF, Myron Deckelbaum,**
**Benjamin Lassoff, Simon Klaymon,**
**Defendants.**

**No. 10042.**
United States District Court
E. D. Kentucky, Covington Division.
Jan. 14, 1957.

Henry J. Cook, U. S. Atty., Marvin Jones, Asst. U. S. Atty., Lexington, Ky., for plaintiff.

Daniel W. Davies, Thomas D. Hirschfield, Newport, Ky., for defendants.

SWINFORD, District Judge.

The defendants are charged by indictment with conspiring to willfully attempt to evade a federal tax and for doing acts making the defendants liable for a federal tax without having paid the tax in violation of 18 U.S.C.A. § 371 and 26 U.S.C.A. §§ 7201, 4401, 4411, and 7262. The violations alleged are charged to have occurred prior to the first day of March, 1956, and continuing up to and including the 19th day of April, 1956. The case is before the court on the following motions filed by the defendant, to wit: for a separate trial under Counts 1 and 3 of the indictment, for a severance under Counts 2, 4 and 5 of the indictment, and for the return of the seized property and the suppression of evidence.

■■ The first two of these motions address themselves to the discretion of the court and have not been briefed by either the defendants or the United States. It is clear from the record that no disadvantage would inure to any of the defendants by a denial of these two motions. The trial of the case as to each of the defendants would require the introduction of all the evidence as pertaining to any or all of the defendants and it would be a needless expenditure of time and financial expense to grant a severance or separate trials. The motion for a separate trial under Counts 1 and 3 of the indictment and the motion for a severance under Counts 2, 4 and 5 should be overruled. An order to that effect is this day entered.

The defendants strenuously insist the motion to suppress the evidence should be sustained. The United States equally as strongly urges the court to overrule the motion. Briefs have been filed by the respective sides in support of their contentions.

On April 19, 1956, Mr. Leroy G. Venable, an agent of the Treasury Department of the United States, in the capacity of technical adviser, Office of the Assistant Regional Commissioner, Intelligence, situated in Cincinnati, Ohio, appeared before the United States Commissioner in Newport, Kentucky, and made the following affidavit for a search warrant:

"The undersigned being duly sworn deposes and says: That he has reason to believe that on the second and third floors of certain premises known as 1045 Monmouth Street, Newport, Kentucky in the Eastern District of Kentucky there is now being *concealed* certain property, namely: betting sheets, betting slips, run-down sheets, scratch sheets, equipment, records and gambling *paraphenalia* which are presently being used in violation of US IRC # 7201, 4401, 4411 (wagering tax law). And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: That affiant together with certain of his agents is engaged in making an examination of this situation in Newport, Kentucky; that he has learned that the premises described are being used in a gambling activity; that records of such activity are being kept at such premises; that affiant has verified that no gambling stamp has been issued to any person at 1045 Monmouth Street, Newport, Kentucky."

On this affidavit the commissioner issued a search warrant which, aside from the formal language in all such instruments, contained the following pertinent statements.:

"Affidavit having been made before me by *Levoy* Venable that he has reason to believe that on the premises known as second and third floors of 1045 Monmouth Street, Newport, Kentucky in the Eastern District of Kentucky, there is now being concealed certain property, namely betting sheets, betting slips, run down sheets, scratch sheets, *equpiment*, records and gambling *paraphenalia* which are presently being used in violation of US IRC Regulations 7201, 4401 and 4411 (wagering tax law). * * *"

The United States agents, immediately upon securing the warrant for the search, proceeded to the address set forth in the warrant. This was a three story brick building as evidenced by Defendants' Exhibit 1. The door opening to the street was locked. The officers knocked and failing to gain admission voluntarily from the occupants forced the door open and proceeded up the stairs to the second floor. In the hallway they announced that they were federal officers and sought admission into the rooms opening out of the hallway. The doors from the hallway to the rooms were locked and the officers with instruments broke them open.

Upon entering the rooms they found the defendants whom they detained. They also found the property which is the subject of this motion and which the United States proposes to use as evidence in the prosecution. It is obvious from the photographs introduced as exhibits and from the evidence that the place was being used solely for the purpose of conducting what is generally known as a handbook on horse racing. These items which were confiscated by the agents included betting slips, rundown sheets, records that indicated bets had been taken on ball games, a large number of pencils, an electric pencil sharpener, racing forms and seven telephones which the officers state were constantly ringing during their occupation of the place.

The raid on this building was a part of an extended, if not nation-wide, effort by the Treasury Department to apprehend those engaged in unlawful gambling who had failed to comply with the law requiring the payment of a federal tax. An investigation had been going on for a number of days prior to the time and throughout various communities in several states. The raid was timed to coincide with similar raids in other parts of the country. Knowledge and information of interstate communications with relation to the running of horse races at various race tracks throughout the country was in possession of the agent who made the affidavit for the search warrant. The information established that this place at 1045 Monmouth Street, Newport, Kentucky, was a part of a system where information on sporting events could be received and bets placed by individuals by telephone communications.

The court is called upon to determine two questions: first, the validity of the search warrant; and, second, the right to the search even though the search warrant may be held invalid. I will consider these questions in the order named.

The Fourth Amendment to the Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Probable cause has been defined by the Supreme Court as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in them-

selves to warrant a cautious man in the belief that the party is guilty of the offence with which he is charged." Stacey v. Emery, 97 U.S. 642, 24 L.Ed. 1035.

The circumstances referred to by the court must be apparent from the facts set out in the affidavit and those facts must be such that a reasonably discreet and prudent person would believe an offense as charged had been committed and that there was probable cause to justify the issuance of a search warrant. Dumbra v. U. S., 268 U.S. 435, 45 S.Ct. 546, 69 L.Ed. 1032. Clearly the affidavit in the instant case does not meet this test. There is no fact set out and it does not contain such chain of circumstances that probable cause of the violation of law in the premises can be said to be established. A careful reading of the affidavit for the search warrant will show that it contains only conclusions of the affiant. There is no recital that the affiant found or determined facts or circumstances on which probable cause could be based other than that he had good reason to believe and did believe that a violation was being committed.

The Constitutional guarantee against unreasonable search and seizure should not be lightly set aside by a general declaration of a non-judicial officer that he has reason to believe and does believe that a crime is being committed. His affidavit must state facts which he knows to be true from observation. Courts should not permit the evasion of the protection of the individual by validating writs issued on sworn declarations which literally comply with the terms of the federal statue on information and belief or conclusions of fact or of law instead of positively alleging the material facts. Ripper v. U. S., 8 Cir., 178 F. 24; Schencks v. U. S., 55 App. D.C. 84, 2 F.2d 185.

A warrant cannot issue by placing an inference upon an inference as it is well established that the basis of a presumption must be a fact and not another presumption. United States v. Ross, 92 U.S. 281, 23 L.Ed. 707; United States v. Carr, 132 U.S. 644, 10 S.Ct. 182, 33 L.Ed. 483.

The following quotation, succinctly stating the rule with citation of additional authorities, is found in Wagner v. U. S., 8 Cir., 8 F.2d 581, 583:

"The evidence before the judge or commissioner who issues the search warrant must be such as would be admissible on trial. Giles v. United States, 1 Cir., 284 F. 208, 214. The commissioner must be furnished with facts—not suspicions, beliefs, or surmises. Veeder v. United States, 7 Cir., 252 F. 414, 164 C.C.A. 338. A mere conclusion is insufficient either in the affidavit or the complaint. United States v. Kaplan, D.C., 286 F. 963, 969."

When the validity of such an affidavit was before the Court of Appeals for the First Circuit in Giles v. U. S., 284 F. 208, 214, the court said:

"It is not enough that the form of this affidavit leaves it possible that the affiant *might* have personal knowledge as to the possession of intoxicating liquor and as to facts tending to show that such possession was illegal. It should have affirmatively appeared that he had personal knowledge of facts competent for a jury to consider, and the facts, and not his conclusion from the facts, should have been before the commissioner." Lochname v. U. S., 9 Cir., 2 F.2d 427; Kohler v. U. S., 9 Cir., 9 F.2d 23.

In the celebrated case of Grau v. U. S., 287 U.S. 124, 53 S.Ct. 38, 77 L.Ed. 212, which went up from this district, it was specifically stated in the opinion that the search warrant could issue only upon evidence which would be competent in a trial before a jury and of such a nature to lead a man of prudence and caution to believe that the offense had been committed.

I am of the opinion that the mere sworn general statements set forth in the affidavit are not sufficient to warrant a judicial finding of probable cause for the issuance of the search warrant and that the search warrant is void.

The United States takes the further position that even if the search warrant is held to be invalid the motion to suppress the evidence should be overruled on the ground that the evidence was secured incident to the arrest of the defendants.

To properly consider this position it is necessary to review, possibly at the expense of repetition, the facts incident to the search.

Mr. Leroy G. Venable, the agent in charge of the search, had been with the Treasury Department since December 28, 1948. Under instructions from the Assistant Director of Intelligence in Washington he attended a conference in Pittsburgh, Pennsylvania, on April 12, 1956, where he obtained information in connection with a handbook establishment or clearing house at 1045 Monmouth Street, Newport, Kentucky. He was furnished with a list of telephone calls which had been made at Namey's Bar and Grill in New Kensington, Pennsylvania, to various cities throughout the United States, including a call to Newport, Kentucky, to a telephone number, Axtel-16121. He was also advised at the conference, and records were made available to him, that telephone calls had been made to another number in Newport, Colonial-13911, and that another call had been made to Juniper-19595. He testified that there were more calls than one but did not give the exact number of calls. He testified further that there had been calls to Hemlock-12713.

With this information, and under instruction of his superiors, he returned to Newport to investigate the nature of the businesses at the location of phones identified by these numbers and if it was found that the businesses were in violation of the federal law he was to conduct raids which were to synchronize with the national effort on the same cause at a given time.

When in Pittsburgh he was advised that Namey's Bar and Grill had made numerous calls to a bar in Steubenville, Ohio, to telephone numbers Atlantic-21792, Atlantic-31632, Atlantic-26304, and that those phones were located at a place where handbooks for sporting events were conducted.

Upon his return to Newport an investigation of the records of the Cincinnati Suburban Telephone Company indicated that calls had been made from telephones located within the premises of 1045 Monmouth Street to the telephone numbers above referred to. He learned that Axtel-16121 was a telephone at 1045 Monmouth Street, Newport.

The witness further testified in answer to questions by the United States Attorney that there was a telephone number in Revere, Massachusetts, 84650, which was called frequently by Namey's Bar and Grill, and that the records of the Cincinnati Suburban Telephone Company showed that numerous calls had been made from telephones located within the premises of 1045 Monmouth Street to the same number in Revere, Massachusetts. He also stated that telephone number Sterling-36877 in Washington, D. C. had been called by Namey's Bar and Grill in New Kensington, Pennsylvania, and that the same number was called by telephones located at 1045 Monmouth Street, Newport, Kentucky.

His investigation of records further showed that the calls from Namey's Bar and Grill in New Kensington to the telephone numbers Colonial-13911, Juniper-19595, and Hemlock-12713 were frequent and that these telephones in Kentucky were at places where persons held wagering tax stamps. He also stated that he received a Chicago, Illinois, telephone number, Ambassador-22766, that was called by Namey's Bar and Grill and that there was also a cross reference to 1045 Monmouth Street, Newport; that the Chicago number had been called by

phones located within the Monmouth Street address.

His investigation disclosed that between December 28, 1955, through March 27, 1956, there was in excess of 3,800 long distance calls from Namey's Bar and Grill in New Kensington. There had been one call made to 1045 Monmouth Street.

The United States offered the facts as above set out at the hearing on the motion to suppress the evidence in an effort to establish the fact that there was an inter-phone communication between 1045 Monmouth Street, Newport, Kentucky, and both local and distant phones to receive and transmit wagers on horse races and other sports.

At the meeting in Pittsburgh, where Mr. Venable acquired much of the information set out above, he and other agents of the department were instructed to return to their respective states and with the evidence provided them conduct a thorough investigation to determine whether or not there was reason to conduct raids. The agent returned and gave the information to his immediate superior who instructed him to proceed with the investigation and assigned additional men that were felt necessary to assist him.

His investigation disclosed that the records of the telephone company showed that there were seven phones located at 1045 Monmouth Street and that the phones were subscribed to in the name of various businesses. Two of the phones, Axtel–12233 and Axtel–12234, were under the name of Bevabar Sales. There were phones at this address in the names of Kentucky Sales and Salvage, United Roofing and Siding Company, and B. Lassoff Realty Company. He further determined that the telephone bills for the Bevabar Sales and the Kentucky Sales and Salvage were mailed to the residence of the defendant, Robert Lassoff.

There were approximately 300 long distance calls per month from the phones within 1045 Monmouth Street. In addition to the above phone calls it is testified to by Mr. Venable that his investigation disclosed a phone call from 1045 Monmouth Street to a telephone number in Barberton, Ohio; that an investigation of another agent disclosed that the telephone number in Barberton, Ohio, was subscribed to by a man named William Griffith who had a past history of being a bookmaker. The address given was 660 West Tuscawara Street, Barberton, Ohio.

It was also found that numerous calls were being made from the Monmouth Street address to a telephone in Louisville, Kentucky, Emerson–84704, and that agents in Louisville had advised that this telephone was located at a place which had been under surveillance by Louisville police officers as a suspected site of a handbook. The investigation in reference to the Louisville phone showed that the calls from 1045 Monmouth Street were being made as late as April 18, 1956, which was the day before the raid. There were approximately 20 calls between the 1st of March and the 18th of April.

This agent and his associates learned that Robert Lassoff and Ben Lassoff were brothers and associated in the enterprises at 1045 Monmouth Street and that these men had reputations of being engaged in handbook operations.

On April 18, 1956, the day before the raid, the location was put under surveillance and two agents were assigned to keep a constant watch. The surveillance started at 2:30 P. M. While on the detail one of the agents attempted to enter the building by the street door and found that it was locked. This effort was made during what was termed normal business hours, at which time it should have been open to the public. At 5:00 P. M. a man was seen to enter the building who was thought to be Robert Lassoff. At 6:40 P. M. three men were seen to leave the building. The hour of 6:40 P. M. is known as the normal closing time for handbook operations in this area. One-

of the three men was identified as Robert Lassoff and the other two as Ben Lassoff and Myron Deckelbaum.

The surveillance was discontinued until 10:00 A. M. on the morning of the 19th of April. At 11:00 A. M. on that day one man was seen to enter the doorway leading to the upstairs. At 11:30 A. M. a man, whom the agent recognized as Ben Lassoff was seen to enter the building. At 12:05 P. M. a man recognized as Ben Lassoff left the building. At 12:06 P. M. another man left the building and went to The Stables cafe which is about two doors from the 1045 Monmouth Street location. At 12:10 P. M. the same man reentered the building. At 2:30 P. M. Ben Lassoff reentered the building. At 2:45 P. M. three men tried to obtain entrance to the building but could not get in as the door was locked. When they could not get in they obtained assistance from a man who operates a feed store within the lower part of the building. This feed store man went into The Stables cafe and shortly thereafter Ben Lassoff came down the steps, opened the door and admitted the three men. At 2:55 P. M. Ben Lassoff, in company with the three men, came out of the building and appeared to be examining the exterior of the building. At 3:00 P. M. the three men left the area and Ben Lassoff reentered the doorway that leads to the upstairs and was not seen to leave the building.

At 3:15 P. M., according to a prearranged plan, approximately 16 agents arrived at the building. Certain of these men were placed at various places to guard the building to prevent escape. It is indicated from the exhibit that there was a doorbell at the front door but it was not used nor did the officers attempt to use it. The agents knocked on the front door and announced that they were federal officers and demanded that the place be opened up. There was no reply and the glass was knocked out of one corner of the door which enabled the officers to open it from the inside. They went up the stairs to the second floor and knocked on the wooden door and announced that they were federal agents and that they wanted admittance. There was no response although they overheard confusion going on inside the place as if the occupants were attempting to run or get away. They knocked the doors down and entered. There in one of the rooms they found the defendants. To use the words of the agent in charge of the raid, the men found in the room "were also frisked for weapons and immediately put under control". The men were kept together in one room. The agent in charge asked Ben Lassoff if he had a wagering stamp and he said that he did not. All of them said they did not have wagering stamps and the agent said to them, "Well, you men know you are under arrest for violation of the Internal Revenue laws."

While this was going on and after the arrest various agents were investigating the premises, answering the phones, and accumulating the evidence which is the subject of this motion.

In support of its position of justification for a search without a warrant the United States cites the case of United States v. Jones, 7 Cir., 204 F.2d 745, 747, certiorari denied 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368. I quote from that case the rule with abundant citation of authorities:

"It is well established that the insufficiency of a search warrant is immaterial when the search and seizure may be otherwise justified. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231; Vachina v. United States, 9 Cir., 283 F. 35, 36; Frayar v. United States, 6 Cir., 3 F.2d 598; Billingsley v. United States, 8 Cir., 16 F.2d 754, 756; Lee Kwong Nom v. United States, 2 Cir., 20 F.2d 470, 472; State ex rel. Merrell v. District Court, 72 Mont. 77, 231 P. 1107, Cf. Murby v. United States, 1 Cir., 293 F. 849, 852. 'When a man is legally arrested for an offense, whatever is

found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution.' "

When a legal arrest is made, with or without a search warrant, it is held that a search is not unreasonable and that a taking into custody of personal articles in the immediate control of the arrested person is lawful. The law does not protect a person against search and seizure but by the wording of the Fourth Amendment he is protected against unreasonable search and seizure. Weeks v. U. S., 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

In United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, the court in its opinion pointed out that a reasonable search cannot be determined by any fixed formula. The Constitution does not define unreasonable searches. The question of reasonableness must find resolution in the facts and circumstances of each case.

Since it is only claimed that the search was made incident to the arrest, the real problem in the case at bar is the lawfulness of the arrest of the defendants. The zeal of agents charged with the responsibility of apprehending tax evaders is admired and should be encouraged. The difficulties encountered in matching the ingenuity of criminals conducting unlawful practices must be recognized by courts in interpreting what is reasonable in the light of modern mid-twentieth century America. The scientific and mechanical inventions and discoveries adapt themselves to use by the underworld as a means to evade the law. Our traditional protection of the individual from unreasonable search and seizure and assurance of his security of person and property from interference by anyone should not be lightly used as a road block behind which he can undermine the rights of the whole people.

The orthodox method of law enforcement is for evidence of crime to be accumulated, presented to a grand jury, the return of an indictment and a warrant to issue for the arrest of the person accused in the indictment. In all cases this, of course, is impractical and therefore exceptions and enlargements are recognized by both the common law and statutes. One of the exceptions is that where evidence is known to the officers they shall go before a judge, magistrate or commissioner and reveal the facts to this judicial officer. If the officer is of the opinion that they are sufficient in law to justify the issuance of a warrant of arrest or search, he shall issue the instrument and place it in the hands of the proper official who in turn is charged with the duty of executing it immediately. Any departure from this procedure, subject to the recognized exception of absolute necessity, is held to be unlawful and as contravening the rights of the individual.

The case at bar presents a rather confused picture. No arrest was made until after the unlawful entry. It appears that the arrest was made during the search and that the search was being made while the arrest was being made. The search was not so much incident to the arrest as it was that the arrest was made incident to the search. The facts in the knowledge of the agents at the time they broke the outer door of the building ascended the steps to the second floor and broke down the doors into the second floor rooms were merely the result of nothing more than hearsay acquired at the conference in Pittsburgh. There was certainly nothing in their observation of the building while they held it under surveillance that would justify their believing that a felony was being committed on the second floor of the building. Even the records of the telephone agencies in the local area, which may be considered as valid first-hand information about which the agents could testify before a jury, indicated no law violation unless coupled to the information acquired at the Pittsburgh conference. It is true they had knowledge of numerous long distance telephone calls

from the 1045 Monmouth Street address but that alone is not sufficient nor does it appear to be so unreasonable as to indicate that the occupants of the building were engaged in operating a handbook for wagers on sporting events. Such evidence standing alone would be insufficient to submit the question of guilt of the accused to a jury.

In my opinion the case of Worthington v. United States, 6 Cir., 166 F.2d 557, covers all of the issues here involved. The distinction may be pointed out that in that case the home of the accused was searched while in the instant case the search was made of the business house occupied by the defendants. In the light of the comparative facts, however, this must be a distinction without a difference in applicable law. In the comprehensive opinion in Worthington v. U. S., supra, the court quoted from Taylor v. U. S., 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951, in which it was pointed out that the officers had abundant opportunity to obtain a warrant for making a search; that there was no probability of material change in the situation during the time necessary to secure such warrant; and that a short period of watching would have prevented any such possibility.

Mr. Venable, in the case at bar, states that he was hurried in making his presentment to the commissioner by reason of the fact that a deadline was fixed for the national crackdown. It is true he may have been hurried from the time he first interviewed the commissioner but there is no reason that I can see why he did not go to the commissioner long before he did, as the evidence and information acquired by the observation of the building was insignificant and not used or set forth in his presentment to the commissioner as reflected by the affidavit for the search warrant.

██ As said by Judge McAllister in the Worthington case [166 F.2d 566], "all the circumstances disclose that the arrest was made as a pretext to search for evidence, and on that ground alone, the evidence should have been suppressed."

██ An arrest must be for the offense and not used as a pretext to search for evidence. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775.

██ The following quotation is taken from the case of Henderson v. U. S., 4 Cir., 12 F.2d 528, 51 A.L.R. 420, which is quoted with approval in Worthington v. U. S., supra:

"It is admitted that the government officers had no warrant either for the arrest of the defendant or for the search of his premises. There is no showing or contention that it was necessary to arrest defendant without a warrant to prevent his escape, and a careful consideration of the evidence leads irresistibly to the conclusion that the search of his dwelling was made, not as an incident of the arrest, but as the chief object which the officers had in view in entering upon his premises. Instead of the search being incidental to the arrest, therefore, the arrest was incidental to if not a mere pretext for the search. The question is whether a search made under such circumstances violates the constitutional rights of the defendant. We think that it does." At page 528 of 12 F.2d

"And when it appears, as it does here, that the search and not the arrest was the real object of the officers in entering upon the premises, and that the arrest was a pretext for or at the most an incident of the search, ought such search be upheld as a reasonable one within the meaning of the Constitution? Manifestly not." At page 531 of 12 F.2d.

██ From the whole evidence in this case I must conclude both that the search warrant was invalid and that the search allegedly incident to the arrest was unlawful. The motion to suppress the evidence should be sustained. An order to that effect is this day entered.