Vincent Iglesias **ARMADA**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19596.

United States Court of Appeals
Fifth Circuit.

July 10, 1963.

Rehearing Denied Sept. 12, 1963.

Henry R. Carr, William B. Seidel, Miami, Fla., for appellant.

Edward A. Kaufman, Asst. U. S. Atty., Miami, Fla., for appellee.

Before RIVES, LEWIS * and BELL, Circuit Judges.

RIVES, Circuit Judge.

Armada and a woman named Hilda Nora Bostizano were jointly indicted for crimes in connection with a large quantity of cocaine, "in excess of four pounds." Bostizano failed to appear for trial, her bail bond was forfeited, and Armada was tried alone. He was adjudged guilty on a jury's verdict under four counts, which charged respectively:

* Of the Tenth Circuit, sitting by designation.

that he and Bostizano concealed the drugs in violation of 21 U.S.C.A. § 174; that they facilitated the transportation of the drugs in violation of 21 U.S.C.A. § 174; that they purchased the drugs in violation of 26 U.S.C.A. § 4704(a); and that they conspired between themselves and with other persons unknown to commit such crimes in violation of 21 U.S.C.A. § 174. Armada was sentenced to imprisonment for five years on each count, sentences to run concurrently, and was fined $2,500.00 on each count.

The cocaine was seized as a result of a search of Armada's automobile. The only question presented on appeal is whether the district court erred in denying Armada's motion to suppress this evidence as being unlawfully obtained in violation of the Fourth Amendment to the Constitution.

At between 9:30 and 9:50 on Saturday evening, July 15, 1961, two days before the search of Armada's car, United States Customs Agent William J. Knierin had a phone call at his home from the Supervisory Customs Inspector on duty at the customs enclosure at the Miami International Airport, Miami, Florida, who told him that a suspect, Hilda Nora Bostizano, a known associate of Armada, was in the baggage examination room. Agent Knierin testified on the motion to suppress:

"* * * At that time I asked him, 'Is she still there? Has she come down from Immigration yet?' And he said, 'Well, I don't know. We got the call late.' And I said, 'I will have to look through the deal (sic) letter file.' And told him, 'You had better find out if she is still there and you had better give me a call.' So ten minutes later, I would say, Mr. Lunderville gave me another call and he told me that the suspect was gone and that she had left the baggage examination room and that the inspector had missed the notification that she was a suspect and that the suspect was on the street."

Knierin and another Customs Agent, William D. Fickie, then proceeded to the office of the United States Customs Agent in the Post Office and examined the existing file involving Armada and Bostizano, and by 11:30 P.M. they had located Bostizano in Room 609 of the Everglades Hotel. The two agents took Room 623, diagonally across the hall from Bostizano's room, and thereafter maintained a surveillance on the hotel lobby and room.

At about 3:30 or 4:00 o'clock on Sunday afternoon, July 16, 1961, these two agents, without a search warrant, entered Bostizano's hotel room and observed two bags or suitcases, which Knierin opened. Both were apparently empty. The smaller bag had a distinct odor of fresh glue, and a close examination revealed a more than normal thickness to the bottom. Knierin further testified:

"* * * So therefore, I attempted to pull first at the upper left hand corner of this bag—the bottom or what looked like to be the bottom of the bag. I gave it a slight jerk. Then I went to the lower right hand corner of the bag and tugged a little bit there. And after this slight tug the whole bottom came up revealing two bags, plastic bags, which fitted into the bottom of this suitcase. These two bags contained a white fluffy shiny sort of crystaline powder."

On the basis of his prior training and experience, Knierin formed an opinion that this substance was cocaine. Continuing, Knierin testified:

"A. Next I took a bottle of glue out of my pocket and I put glue around the pieces of fabric covering, this hard piece of cardboard that was the false bottom, and I glued the fabric back to the false bottom.

"Q. Now, subsequently did you discuss what you had seen in these suitcases with any of the other agents?

"A. Yes, sir. I discussed it immediately with Mr. Fickie, of course, and shortly later that afternoon, in view of the fact that it was drag-

ging on, we called in Agent Romano and Agent Romano and I stayed in the room together and I discussed what I had found in the suitcase and other information that I had derived from the reading (sic) the file with Agent Romano.

"Q. Did you ever discuss this with Agent Doughney, that you recall?

"A. In a small manner. Yes, I told him what was in the suitcases, what I had seen and what I thought was in the suitcases. I told him a little bit about Mr. Armada's background, but that was not on a large scale."

As to information conveyed to Agent Romano, he further testified:

"I told him that Hilda Nora Bostizano was placed on the suspect list only because of association in South America with dealers who produced cocaine and with Vincent Iglesias Armada. I told Mr. Romano that Mr. Armada had been on the suspect list for six or seven years and we suspected him of dealing in cocaine and bringing it up in false bottom suitcases usually and mostly with women couriers.

"By Mr. Pearson:

"Q. Do you remember discussing this with Mr. Doughney?

"A. I discussed it with Mr. Doughney but not near in length that I went into it with Mr. Romano."

When Knierin testified that he had no search warrant or other process authorizing him to search Bostizano's hotel room, Armada's attorney entered the following objection:

"Mr. Carr:

"Now, Your Honor, I realize that legally I cannot object to a search— on behalf of Mr. Armada—unless he claims a proprietary interest in that room, which, of course, we say he does not claim. But here again we submit to the Court that a request for postponement was made on the basis that we would prefer to be tried in company with the Bostizano woman who, if present, could undoubtedly make a legal objection to the admission of this testimony. But if such a ground be not available to the defendant, Armada, at least the grounds that the search of the room of a defendant not present and not on trial and not shown to be in privity with the defendant Armada is irrelevant and immaterial, and there must be some manner of objection that would be available to Armada. And I submit that I am justified in the position which I take by virtue of the testimony of the witness who said that he did not have any legal process or authorization to make this search.

"The Court:

"Do I understand that you are moving to strike this testimony?

"Mr. Carr:

"Yes, sir, I move to strike the testimony of the witness with regard to the search of room 609 on Sunday and his statement of what was observed there.

"The Court:

"Not on the ground that you have any legal objection on behalf of your client but just because you think justice requires it?

"Mr. Carr:

"No, Your Honor. Let me state it again, respectfully. I know that in order to make an objection to a search a defendant must claim a proprietary interest. We do not assert that. Therefore, we cannot object. I did not raise that ground.

"But to search another person's home or possession or person is not binding on us in my respectful opinion and it is irrelevant and immaterial. And I am objecting on the basis that this search is irrelevant and immaterial so far as Armada is concerned and on that basis I feel the objection is legal and valid."

The court overruled that objection and it is not further pursued on this appeal.

The surveillance continuing, on the evening of Sunday, July 16, Agent Michael A. Romano was called in to assist. Agent Knierin briefed him on the situation. Nothing happened that evening. On Monday morning, July 17, Mrs. Bostizano left the hotel on foot. After about 25 minutes, she returned at about 10:50 or 10:55 A.M. She asked the bell captain of the hotel, George Gunn, to come to her room and get her baggage. Gunn put the larger suitcase on his truck, and he and Mrs. Bostizano proceeded to the lobby and to the hotel's south exit. Some man picked up the suitcase and handed Gunn a dollar tip. The doorman, Robert Nolen, who had been alerted by Agent Doughney, had seen Armada drive into the circular drive, onto which the hotel's south exit opens, about 15 minutes before Mrs. Bostizano and Gunn arrived with the suitcase. Nolen saw Armada take the suitcase from the truck and place it in the trunk of his car.

Shortly after the car pulled out Nolen had a conversation with Agent Doughney which he related as follows:

"Well, he said it was just too bad that these people got away, and I said, 'I have made a notation of the make of the car and the license number. If this will help you, here it is.' So then he picked it up and handed it to another agent and another agent called the city police over my phone at the desk."

The agent's call to the Police Department was at about 11:00 A.M. to put in an "all points bulletin" on the car. Several of the agents joined in the search for the car. About an hour later, Armada again drove into the circular drive, parked his car, and alighted. As he drove up, the doorman Nolen told Agent Doughney, "here comes your party now." Doughney stepped back into the hotel lobby and informed Agent Romano. Romano accosted Armada, exhibited his credentials and advised him that he was a federal officer. According to Armada's testimony,

"  *   *   * He was looking for me on the sidewalk and I was standing there close to my car. And he said, 'Are you the owner of that car?' I said 'Yes, sir, I am.' And he said, 'Where did you take the suitcase the lady gave you?' And I said, 'I took it nowhere. I was supposed to take it to be repaired but it is right there in the car.' So he said—well, after he produced the identification —he said, 'Where is your gun?' And I said, 'What do I need a gun for?' And he said, 'You are right.' So he said, 'Don't you move. Just open the car. Let's see the suitcase and stay there and don't move and nobody gets hurt.'"

Armada opened the trunk of the car and Romano, with Doughney standing by, made a cursory examination of the suitcases, the smaller suitcase being inside the larger, without finding the cocaine. He then called for Agents Fickie and Knierin to come down to the car. The trunk lid was again lifted and Agent Fickie located the false bottom in the smaller suitcase containing the two plastic bags with the white substance, later identified at the trial as cocaine. Armada was then placed under arrest.

The search was not incident to the arrest because Armada was arrested only after the search had been completed. There is no contention on appeal that Armada voluntarily consented to the search. The Government's position is simply that it was reasonable for the customs agents to search the automobile in a state of mobility without a search warrant, based only on probable cause to believe that it contained the cocaine which was subject to seizure and destruction; that such a search is not violative of the Fourth Amendment which protects against *unreasonable* searches and seizures. We agree.

The search of Mrs. Bostizano's hotel room in which the cocaine was first discovered was not an invasion of Armada's privacy. He has no standing to raise and does not in fact question the legality of that search. See Jones v. United States, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 et seq.

Before making the search of the automobile, the agents had information which constituted probable cause to believe the suitcases contained cocaine, and Armada had admitted the suitcase "is right there in the car." Unless Armada was arrested or the car was seized, the automobile could readily be moved.

The cocaine was contraband. 49 U.S.C.A. § 781(b) (1). The automobile used for its transportation was subject to be seized and forfeited. 49 U.S.C.A. § 782. The rule of the Carroll case is applicable:

> "On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."

Carroll v. United States, 1925, 267 U.S. 132, 149, 45 S.Ct. 280, 283, 69 L.Ed. 543. See also, Husty v. United States, 1931, 282 U.S. 694, 700, 51 S.Ct. 240, 75 L.Ed. 629; Brinegar v. United States, 1949, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879; compare United States v. Di Re, 1948, 332 U.S. 581, 584, 585, 68 S.Ct. 222, 92 L.Ed. 210.

Appellant argues that the decision in Carroll v. United States, supra, is limited by the Di Re opinion, supra, 332 U.S. at 584, 68 S.Ct. at 223, to searchers and seizures for the enforcement of the National Prohibition Act. While the language of Di Re lends some plausibility to that contention, the decision did not so hold, and that Carroll is not so limited is now well established. Howard v. United States, 5 Cir. 1962, 307 F.2d 350; Bruner v. United States, 5 Cir. 1961, 293 F.2d 621; Patenotte v. United States, 5 Cir. 1959, 266 F.2d 647.

The cocaine in the present case was as thoroughly contraband and rendered the vehicle just as much subject to seizure and forfeiture as did the liquor in the Carroll case. Compare Sirimarco v. United States, 10 Cir., 1963, 315 F.2d 699; Ted's Motors, Inc. v. United States, 8th Cir., 1954, 217 F.2d 777.

The appellant argues that the hour during which there was an "all points bulletin" on the car gave time to secure a search warrant. The circumstances, however, called for pursuit before disposition could be made of the contraband cocaine. The officers could not foresee that the pursuit would last for an hour, nor that Armada, unaware of the surveillance, would return to the hotel.

The appellant relies on Rent v. United States, 5 Cir., 1954, 209 F.2d 893, 897, and argues that "when the automobile was finally located and searched, it was parked in the hotel's circular drive, the automobile was not occupied and the keys were in the possession of the defendant who was approximately thirty-five feet from the automobile. Prior to the search and seizure the two agents approached the defendant, and at that time he was no longer free to drive away." The circumstances in Rent were entirely different. Here Armada was free to drive away unless he was arrested or the automobile was seized or searched. What was said in United States v. Walker, 4 Cir., 1962, 307 F.2d 250, 252, applies here:

> "Appellant would limit Carroll to those cases where the vehicle is in transit on a public road or highway. However, this argument ignores the basic reason for the Carroll doctrine—that a vehicle by its very nature can be quickly moved out of the locality or jurisdiction in which the warrant might be sought and law enforcement thereby frustrated. This very practical consideration is present whether the vehicle is in transit on the open road or parked."

Under all of the facts and circumstances of the case, we agree with the district court that the search of the automobile and its contents was reasonable. The judgment is therefore

Affirmed.