**Carlos GARCIA, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 21084.**

United States Court of Appeals
Ninth Circuit.

July 27, 1967.

Rehearing Denied Sept. 25, 1967.

Anthony C. Gilbert, San Francisco, Cal., for appellant.

William M. Byrne, Jr., U. S. Atty., Robert Brosio, Stephen Miller, Craig Jorgensen, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before MADDEN, Judge of the United States Court of Claims, and BARNES and MERRILL, Circuit Judges.

MADDEN, Judge:

This is an appeal *in forma pauperis* from the conviction of the appellant on count three of a three-count indictment charging him with violations of § 174 of Title 21, United States Code. Count three charged him with knowingly and unlawfully receiving, concealing and facilitating the concealment and transportation of 1.190 grams of heroin, a narcotic drug, which he knew previously had been imported into the United States of America contrary to the provisions of Title 21, United States Code, § 173. The appellant, having waived jury trial, was tried and convicted by the district court. He received a ten-year sentence, and a

recommendation by the court that he be committed to a hospital for treatment for narcotics addiction.

■ The appellant was arrested in his home, and a search of the house following the arrest discovered the heroin, which was introduced in evidence at his trial. In this appeal he contends that he was arrested without probable cause and that, therefore, the heroin discovered in the search pursuant to the arrest was not admissible in evidence at his trial. If the appellant is correct in his contention that he was arrested without probable cause, it is elementary that the search and seizure of the heroin was illegal and that the seized heroin was inadmissible in evidence.

■ Our basic problem, then, is to determine whether the arrest was without probable cause. "Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they have had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See also Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Federal Narcotics Agent Briggs was in charge of the investigation which led to the arrest of the appellant Garcia. Briggs gave the order to make the arrest. We recite what was known to Briggs at the time he gave the order to arrest. On December 8, 1965, Federal Narcotics Agent Saiz made a purchase of heroin from one Sanchez.[1] Sanchez told Saiz that when he desired to purchase more heroin he should telephone Sanchez. Saiz did so on December 9 and Sanchez said the heroin would be available on December 10. On the tenth Saiz telephoned Sanchez at about 12:30 p. m. and arranged to purchase one-half an ounce of heroin. Sanchez told him to come to Sanchez' home, which was in Los Angeles. Saiz drove there, Sanchez got into the auto with him and said they would go to the house of a friend of Sanchez to pick up the heroin. They drove to a location designated by Sanchez, who then made several calls from a pay telephone. They then drove to another location, where Sanchez made another telephone call, returned to the auto and told Saiz that the heroin would be ready at 3 p. m. Saiz then took Sanchez back to Sanchez' home, left him there, and went and reported the events to Briggs. At about 3 p. m. Saiz again picked up Sanchez at his home and they drove to a place designated by Sanchez, where they picked up Paul Perez. Briggs, following Saiz' car for the purpose of surveillance, saw Perez in the car with Saiz and Sanchez and recognized him as a man who had previously been convicted of violating federal narcotics laws. Perez directed Saiz to drive to a specified location, where Perez got out, went to the rest room of an automobile service station, came back to the car and showed Saiz and Sanchez two rubber condoms each containing a white substance which appeared to be heroin. The three men then drove to the 300 block of Gifford Street. On the way, Perez told the others that the substance which he had exhibited was the heroin which would be sold to them, but that it was pure heroin and would have to be "cut," i. e., adulterated, before it would be sold. When they arrived on Gifford Street Perez told the other men to drive to a designated area nearby and he, Perez, would send someone there to meet them. Perez got out of the auto and walked along Gifford Street. The others drove around the block, parked the car in the area designated by Perez, got out of the car and waited. Within a few minutes a man came to the sidewalk in front of the house which was the third house on Gifford Street, counting from Gifford's dead-ending into Michigan Street. Saiz saw the man make a slight

1. Sanchez was indicted and tried with appellant Garcia. He was convicted on counts 1 and 2 of the indictment. He did not appeal his conviction.

motion with his hand, which motion Saiz took to be a signal to Sanchez to come to where the man was standing. Then Saiz and Sanchez got back into their car and drove to a location nearer to where the man who had made the motion was standing. Sanchez got out of the car and walked to the man who had signaled to him. Together those two walked to a nearby store. They came out of the store and had a conversation, the words of which Saiz could not hear accurately. Then Sanchez returned to Saiz' car and got in. Saiz asked him if he had obtained the heroin. He said he had not, that "Lone" or "Lonie" had said that the heroin was not ready and that "they" would call Sanchez when it was ready. Saiz asked Sanchez if the man he had been talking to was the one who was to deliver the heroin and Sanchez said he was. Saiz then again drove Sanchez to Sanchez' home, making arrangements to call him later to learn whether Sanchez had received word that the heroin was ready. Saiz then went and reported to Briggs. Two Los Angeles County deputy sheriffs, Kennerly and Penland, took part in that conference. Saiz' report of the activities on Gifford Street reminded Briggs that four or five years earlier he had participated in the arrest of one Carlos Garcia, who bore the nickname "Lonie," at 320 Gifford Street for narcotics law violations, that Garcia had pleaded guilty, been sentenced to prison, and had been released from prison only about a year ago, i. e., before the time involved in this case. One of the deputy sheriffs told Briggs and Saiz that the sheriff's office had at some recent time received an anonymous telephone call from a woman who said that her son was obtaining narcotics from a man who had a telephone number which she recited; that the sheriff's office had learned from the telephone company that the telephone was in the house at 320 Gifford Street in the name of Andreas Garcia. Briggs had Saiz describe the man whom Saiz had seen talking to Sanchez and whom Sanchez had called "Lone" or "Lonie." Saiz' description, in Briggs' opinion, fitted

Carlos Garcia, whom Briggs knew. Saiz then resumed his activities with Sanchez, and Briggs, the deputy sheriffs, and certain federal narcotics agents undertook to observe events. At about 6 p. m. Saiz telephoned to Sanchez at Sanchez' home, was told to come there, did so, was told by Sanchez that Sanchez had received word that the heroin was ready but that Sanchez could not go with him until a few minutes later. Saiz left, reported to Briggs what he had learned, returned to Sanchez' house. Sanchez got into the car, told Saiz that his friend had told him that the heroin was ready and that they were waiting for Sanchez. They drove to a location near, but not on, Gifford Street. Sanchez requested and received the $100 which had been agreed upon for the half ounce of heroin. Sanchez walked away, out of Saiz' sight. Briggs, who had followed the Saiz car, observed that Sanchez walked to 320 Gifford Street and entered the front gate leading to the house. There was a link chain fence across the front of the yard some fifteen or twenty feet from the house. Narcotics Agent Borquez, who had been assigned by Briggs to observe events, rode along Gifford Street with Deputy Sheriff Kennerly, who pointed out to him the house at 320 Gifford Street. Briggs, by radio, had directed Borquez to follow Sanchez, who had just gotten out of Saiz' car. Borquez followed Sanchez on foot and saw him meet, just inside the gate at 320 Gifford Street, with the man who answered the description which Briggs had given Borquez over the radio as the description of Carlos Garcia. Borquez saw Sanchez leave 320 Gifford Street and turn a corner at which point he was lost to Borquez' view. Borquez radioed his information to Briggs, who gave him further directions. Sanchez returned to Saiz' car, said he had given the money to his friend, and directed Saiz where to park his car. Saiz followed this direction. Sanchez walked away again. Borquez parked on Gifford Street, saw two men answering Briggs' description of Garcia and Perez come out of 320 Gifford Street,

walk away and return a few minutes later to that address. A taxicab came and someone got in it and drove away, but Borquez could not, on account of the glare of the lights, identify the passenger or the type of taxi. Sanchez returned to Saiz' car and showed Saiz two rubber condoms apparently containing heroin. They drove away, Saiz asked Sanchez for the condoms, Sanchez refused, saying that he would not give them up until Saiz had divided with him. Saiz gave a prearranged signal to Briggs and other officers who were trailing his car. Sanchez was then arrested. There was a struggle, in which he attempted to swallow the containers of heroin or preserve them in his mouth. A good deal of the heroin was spilled but some was saved. As we have said, Sanchez was indicted, convicted, and has not appealed. After the arrest of Sanchez, Briggs, by radio, directed Borquez to arrest Garcia and Perez. He, accompanied by federal narcotics officers and Los Angeles County deputy sheriffs, arrested Garcia.

■ There was probable cause for the arrest. The personal knowledge which Briggs had, and the reliable information which he received as the events happened from other officers, was sufficient to comply with the Supreme Court's definition of probable cause which we have quoted in this opinion. The fact that much of Briggs' information was hearsay did not impair its validity to constitute probable cause. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The information tended strongly to show that Garcia had engaged in criminal narcotics activities within minutes before his arrest.

■■ The appellant contends that he was not given the warnings required by the Constitution after he was arrested and before he admitted that heroin found in his house by Agent Briggs belonged to him. He was given the warnings required by the Supreme Court of the United States in the case of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct.

1758, 12 L.Ed.2d 977 (1964). The appellant's trial began on February 3, 1966. The law applicable to his trial, so far as concerned warnings of constitutional rights, was the law as stated in Escobedo. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The appellant, at oral argument, urged that regardless of the Supreme Court's decision in Johnson v. State of New Jersey, the decision of this court in Wright v. Dickson, 336 F.2d 878, 882 (CA 9, 1964), was the law in this circuit at the time of his trial. An inferior federal court is not privileged, as is a state court, to accord to an accused person more extensive rights than those granted by the Constitution or laws of the United States. See, in the following order, Department of Mental Hygiene v. Kirchner, 60 Cal.2d 716, 36 Cal.Rptr. 488, 388 P.2d 720 (1964), 380 U.S. 194, 85 S.Ct. 871, 13 L.Ed.2d 753 (1965), 62 Cal.2d 586, 43 Cal.Rptr. 329, 400 P.2d 321 (1965). Wright v. Dixon, supra, must have been overruled *sub silentio* by Johnson v. State of New Jersey, supra.

■ The appellant urges that his admission that the heroin found in the search of his house belonged to him was not voluntary because, he testified, his father had told him that the officers had told the father that if he, the appellant, did not admit the ownership the officers would arrest the father. The father was not called by the appellant to testify to such a threat. It may be that appellant's testimony that his father had told him of such a threat was admissible on the ground that it was not hearsay since it was offered not to prove that the father had been threatened but only to prove that the father told the appellant that he had been threatened, and that the appellant had been coerced by what he had been told, whether it was true or not. However, the trial court was not obliged to believe appellant's testimony that he had been told of such a threat. And in any event the trial court said that it had no reasonable doubt as to the appellant's guilt as to count III even if it excluded the inculpatory statement as to the own-

ership of the discovered heroin. The court's conclusion in this regard is well supported by the evidence which we have recited hereinabove.

 The appellant contends that, even if there was probable cause for the arrest, the arrest was illegal because of the manner in which it was accomplished. We disagree with this contention. Narcotics Agent Borquez approached the back door of the appellant's house. The door was open, the appellant was standing in plain sight a few feet inside the door. Borquez identified himself as a narcotics officer, and told the appellant that he was under arrest. The appellant turned away from Borquez, whereupon Borquez drew his gun and seized him. The appellant cites no authority which supports his contention. Mangasser v. United States, 335 F.2d 971 (CA 9, 1964), upon which appellant seems to rely, was decided on the ground of lack of probable cause for the arrest.

 The appellant urges that his arrest was invalid, even though there was probable cause, because it was made without a warrant. Even if the doctrine stated in Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), that "law enforcement agents must secure and use search warrants whenever reasonably practicable" were still the prevailing rule and were applicable to arrests as well as searches, this case would not be suitable for its application. Some of the events constituting probable cause for the appellant's arrest occurred only minutes before the arrest. The arrest of Sanchez would quite certainly have become known to the appellant and could have resulted in the destruction of evidence and might have resulted in his flight, if the time necessary to obtain a warrant had been permitted to elapse. In any event, Trupiano was expressly overruled by United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). See McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

 The appellant says that the search of his bedroom, which discovered the heroin introduced in evidence, was an illegal search even if it had been made as an incident to a valid arrest. The house was a small one with only one bedroom. The door to the bedroom was within a few feet of where the appellant was standing when he was arrested. The search was not an illegally exploratory search. United States v. Rabinowitz, supra; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

The judgment is affirmed.