**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Reginald Jerome SHYE et al., Defendants-
Appellees.**

**No. 72–1611.**

United States Court of Appeals,
Sixth Circuit.

Jan. 23, 1973.

Joe B. Brown, Asst. U. S. Atty., for plaintiff-appellant; Charles H. Anderson, U. S. Atty., Nashville, Tenn., on brief.

Robert S. Brandt (Court Appointed), Nashville, Tenn., for Reginald Jerome Shye.

Wm. Buford Bates (Court Appointed), Nashville, Tenn., for James Edward Cox.

Carlton H. Petway (Court Appointed), Nashville, Tenn., for James Clarence Floyd, Jr.

Clark H. Tidwell (Court Appointed), Nashville, Tenn., for James Alfred Stevenson.

Before EDWARDS and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

McCREE, Circuit Judge.

The Government appeals, pursuant to 18 U.S.C. § 3731, from the granting, in part, of defendants' pretrial motion to suppress evidence seized by law enforcement officers in the course of defendants' apprehension.

The hearing on the motion established the following facts. On January 18, 1972, a branch of the Nashville City Bank and Trust Company was robbed shortly after noon. Bank employees described the robbers as four Negro males, one short, one tall, and two about six feet in height. Some of the robbers wore leather-like long coats, one of which was lavender; the short robber wore a ski mask; and three wore hats, one of fur and another with a wide brim. The short man had a sawed-off shotgun and two others had pistols. They used a white sack to carry off the money (about $10,549), and Mr. Angel, a bank employee, observed them driving away in a 1968 or 1969 two-toned, fastback Ford Fairlane.

On January 17, the day before the robbery, Nashville police officer Luther Summers had observed defendant Cox working on a Ford Fairlane similar to the one described above. Officer Summers had gone to Cox's apartment to question him about another armed robbery, but instead of confronting Cox he apparently stayed in his car and watched the suspect go back and forth between the Ford and an apartment nearby. Officer Summers recorded the license number of the car and then departed.

When notice of the bank robbery was broadcast over the police radio on January 18, officer Summers went to the scene with other law enforcement agents. Upon questioning bank employees and receiving the description of the get-away car, he thought of the car on which he had seen Cox working the day before. He ascertained from officers in a patrol car in Cox's neighborhood that the Fairlane was parked near Cox's apartment, and in the company of FBI agents and other police officers he then proceeded to the parking lot in back of Cox's apartment where the Fairlane was parked.

FBI agent Darrell Hamar testified that the car was parked about 30 to 50 yards from the apartment which Cox had been observed entering the day before. Hamar, who was the agent in charge of the investigation, ordered by radio a check of the license plate of the Fairlane, and while that was being made, he looked into the car and saw in plain view a white sack and a hip-length wool coat on the seat. He then felt the car radiator, which by its warm temperature indicated that the car had recently been driven. The bank employee who had described the get-away car was brought to the scene, where he identified the Fairlane as the car he had seen leaving the bank. At about the same time, the license plate check revealed that the plates on the Ford were registered to a Chevrolet. Agent Hamar then ordered a general search of the car, which resulted in the discovery and seizure of a sawed-off shotgun under one

of the seats. The white sack and the coat were also seized.

While the automobile was being investigated, a number of officers went to Cox's apartment after having been informed by officer Summers that he had previously seen someone from that apartment driving the Fairlane. The officers knocked on the door and received no response. They attempted to secure a key with which to open the door, but they could not find a key that would work. There is some indication that they discovered that one of the apartment occupants would soon be home, but in any event they staked out the apartment, placing officers at both the front and rear entrances, until about one hour had elapsed from the time of their initial attempt to gain entry. At that point, someone from inside the apartment said, "We're coming out," and the front door of the apartment began to open. The door then stopped, and through the opening one officer saw several Negro males inside. A voice allegedly said from the apartment, "Come on in," and the officers, armed with shotguns, burst into the apartment, notified the four male occupants that they were under arrest, and immediately placed the occupants against the living room wall, face first, with their hands on the wall and their feet back away from the wall, so that they could be searched for weapons and placed under control. While six or seven armed officers were accomplishing this, other officers fanned out through the rest of the apartment to determine whether there were any other occupants. The officers remained in the apartment for an unspecified time, and they conducted a general search of the premises, which resulted in the seizure of four sacks of money and money from other sources for a total of $10,541, three pistols, six bullets, three coats, two of which were leather, a fur cap, a ski mask, and two brown hats.

The apartment occupants were each charged with two counts of armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a) and (d). All defendants moved to suppress all items seized from both the automobile and the apartment. Following a hearing, the District Court granted the motion with respect to the items taken from the automobile on the ground that there were no exigent circumstances excusing the failure of the law enforcement agents to obtain a search warrant. With respect to the items seized from the apartment, the Government conceded the inadmissibility of three sacks of money and a pistol, found under the living room couch, on top of a water heater in the hall, in a wastebasket in a bedroom, and in a hall linen closet, respectively. The District Court upheld the seizure of six bullets from the pocket of one of the defendants and the plain-view seizure of a leather jacket, ski mask, pistol, and fur cap from the living room. The court also upheld the seizure of certain items from a bedroom, including two brown hats, a coat with a pistol in the pocket, a card case containing $1,100, and a leather coat, on the ground that these items were in plain view of officers lawfully searching for additional suspects.

However, the court ordered two items suppressed. The first was money concealed in a paper bag on a shelf in a bedroom closet; the Government has not appealed the determination that the seizure of this item was unlawful. The second was a sack of money that was found between a water heater and an adjoining wall, about four feet to the right of the suspect against the living room wall who was closest to the water heater. Between the suspect and the water heater was a hallway, and the water heater was apparently in a closet-type depression in the wall. The court held that the sack of money was not within the immediate control of the defendants even though it

was only a few feet away from one of the defendants at the time it was seized. However, at the time it was actually seized, the officers had the situation completely under control, and the aforesaid defendant was positioned against the wall being

searched, surrounded by a number of gun-wielding officers. The bag was merely one of items in the closet, and a police officer was positioned between the closet and the nearest defendant. Under these circumstances, the Court is of the opinion that seizure of the bag cannot be justified as the fruit of a search of the area within an arrestee's immediate control.

Order of the District Court at 4 n. 5. The Government has appealed the suppression of this sack of money.

■ Assuming *arguendo* that all four defendants have standing to object to the search of the automobile, which was owned by defendant Floyd, we conclude that the law enforcement agents had probable cause to search the car and that exigent circumstances justified the failure of the agents to seek a warrant prior to the search. The agents clearly had probable cause to believe that the car had been used in the commission of a felony and that the car contained instrumentalities, fruits, or evidence of the felony: they observed a white sack similar to the one used by the bank robbers to carry off the money, the radiator was warm, the license plates were registered to a different car, and a bank employee identified the car, which was apparently quite distinctive, as the car he saw being driven away from the bank. We have no difficulty in concluding that "the facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that [instrumentalities or fruits of the robbery were] . . . in the automobile which they . . . searched," Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), and that the agents had probable "cause to believe that the evidence sought [by the search of the car would] aid in [the] apprehension or conviction" of the bank robbers. Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967).

Indeed, appellees do not seriously dispute this point. They assert, however, that the exigent circumstances necessary to justify a warrantless search of the automobile, Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, *supra*, have not been shown to have existed in this case because there was no danger that the car would be moved before a warrant could be secured. The car was under police guard, no one was in it, and thus the defendants could not have obtained access to the car to remove it. Appellees rely on the plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443, 458–464, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

We believe that *Coolidge* is inapposite and that, "on balancing the need for effective law enforcement against the right of privacy," the warrantless search of the car was justified by "exceptional circumstances." Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). The search of the car occurred less than two hours after the robbery, at a time when the money taken from the bank was likely still to be within the possession of the bank robbers and when the robbers likely were still together. The radiator of the car was still warm, which indicated that if indeed this was the get-away car, the bank robbers had only very recently left it. Ascertaining this would have enabled the officers then to investigate the area to determine whether anyone had seen the robbers alight from the car or to determine whether there were indications in the neighborhood that the robbers were in a particular dwelling. One of the officers knew that a man working on the car the previous day had come out of a particular apartment, and the police could have staked out that apartment to determine whether its occupants were in fact connected with the robbery. In sum, the law enforcement agents had to know immediately whether they were in a situation which contained great

promise of the speedy apprehension of the robbers and recovery of all the stolen money (especially since, if this was the car, the robbers would not likely expect that the police were so close to apprehending them and thus could have been expected either to be within the immediate vicinity of the car or at least not to have taken elaborate precautions to impede pursuit or detection) or were completely off the scent and should be focusing their efforts elsewhere. Especially when it is considered that the robbers were armed and therefore could be considered dangerous to law enforcement agents or to the public, it was imperative for the agents to know whether they were on the heels of the culprits. Time was clearly of the essence, and thus it was not practicable for the police to delay while a warrant was obtained. *See* Warden v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Schmerber v. California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Hernandez v. United States, 353 F.2d 624, 627 (9th Cir. 1965), cert. denied, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966); United States v. Thomas, 319 F.2d 486, 488 (6th Cir. 1963); *cf.* Terry v. Ohio, 392 U.S. 1, 20–23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 391–394 (1970) (en banc); Garcia v. United States, 381 F.2d 778, 783 (9th Cir. 1967), cert. denied, 390 U.S. 1015, 88 S.Ct. 1268, 20 L.Ed.2d 165 (1968). We do not rely on the movability of automobiles to justify this warrantless search, *see* Chambers v. Maroney, *supra,* but instead on the existence of exceptional circumstances which because of the imperative of time excuse obtaining prior judicial approval in very narrowly defined situations. The lengthy pre-seizure surveillance in *Coolidge,* as well as the forced removal of the suspect's wife from her house and the stationing of police guards at the dwelling, established the lack of need for immediate action by the police. *Com-* *pare* McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

Alternatively, seizure and subsequent search of the automobile can be justified on the ground that the car itself constituted evidence or an instrumentality of the crime, was parked in a public way knowingly exposed to the public, and was thus subject to impounding by law enforcement agents with probable cause to believe that it could be used in a trial of the suspects. Whether seizure of the car be justified by application of the "plain view" doctrine, *see* Harris v. United States, 390 U.S. 234, 88 S.Ct. 718, 17 L.Ed.2d 547 (1968); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); by analogy to cases in which instrumentalities or evidence of crimes are abandoned in public places, *see* Capitoli v. Wainwright, 426 F.2d 868 (5th Cir.) (per curiam), cert. denied, 400 U.S. 906, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); Trujillo v. United States, 294 F.2d 583 (10th Cir. 1961); Lee v. United States, 95 U.S.App.D.C. 156, 221 F.2d 29 (1954); or by reference to cases in which law enforcement agents have probable cause to believe that an automobile has been used for the transportation of contraband and is therefore subject to forfeiture, *see* Kaplan v. United States, 375 F.2d 895 (9th Cir.), cert. denied, 389 U.S. 839, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Drummond v. United States, 350 F.2d 983 (8th Cir. 1965), cert. denied, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966); Armada v. United States, 319 F.2d 793 (5th Cir. 1963), cert. denied, 376 U.S. 906, 84 S.Ct. 659, 11 L.Ed.2d 605 (1964), no protectible privacy interest of the car's owner or occupants has been invaded. *See* Coolidge v. New Hampshire, *supra,* 403 U.S. at 513, 520, 91 S.Ct. 2022 (White, J., dissenting); *cf.* Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). And, because seizure of the car was justifiable

in light of its integral relationship with the crime being investigated, a contemporaneous search closely related to the reason for impounding and retaining the car, when there was probable cause to believe that the car contained fruits, instrumentalities, or evidence of the crime, did not violate the Fourth Amendment. *See* Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Coolidge v. New Hampshire, *supra,* 403 U.S. at 522, 91 S.Ct. 2022 (White, J., dissenting); *but see* Harris v. United States, 125 U.S.App.D.C. 231, 370 F.2d 477, 481–483 (1966) (separate opinion of Wright, J.), aff'd, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Accordingly, the District Court erred in suppressing the items taken from the automobile.

■ However, we agree with the District Court that the sack of money taken from behind the water heater in the apartment was unlawfully seized by the law enforcement agents. We do not accept the Government's contention that the sack of money was properly seized incident to the arrest of the defendants under the rule stated in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Court emphasized in *Chimel* that warrantless searches, whether or not incident to arrest, were the exception, not the rule, and that only the exigencies of preventing harm to the arresting officers, the escape of the suspects, or the destruction of evidence justified search of the arrestee's person and of the area within his immediate control. When the circumstances at which this limited exception was aimed do not exist, no reason appears for invoking it. In this case, the suspects were lined up against a wall and were quickly searched for weapons, a search which revealed only six bullets in the pocket of defendant Stevenson. The District Court found that when the sack of money was seized, "the officers had the situation completely under control," that the sack was merely one of a

number of items in the closet in which the water heater was situated, and that a police officer was positioned between the closet and the nearest suspect. On these facts the court concluded that the area from which the sack was seized was not within the suspect's immediate control as that area is defined in *Chimel,* and we determine that this finding is not clearly erroneous. Therefore, the court did not err in holding the seizure of the sack of money not properly incident to the arrest.

■ Completely without merit is the argument of the Government that the sack of money was lawfully seized because it was in "plain view" of the law enforcement agents. All that was in plain view was a plain brown bag, which did not itself constitute evidence, a fruit, or an instrumentality of the crime. *Compare* People of State of California v. Hurst, 325 F.2d 891, 898–899 (9th Cir. 1963), rev'd on other grounds, 381 U.S. 760, 85 S.Ct. 1796, 14 L.Ed.2d 713 (1965). As Mr. Justice Stewart stated in Coolidge v. New Hampshire, *supra,* 403 U.S. at 466, 91 S.Ct. at 2038, "the extension of the original justification [for intruding onto the premises] is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." It is true, as the Government argues, that bags are made to contain things, and the bag might well have contained a weapon or evidence. However, closets or drawers of a dresser or rooms in an apartment are made to contain things, but the plain view doctrine does not allow general searches of such areas within the view of the arresting officers in the hope that incriminating evidence will turn up. *See* Chimel v. California, *supra,* 395 U.S. at 763, 89 S.Ct. 2034.

Accordingly, we find it unnecessary to decide whether the officers were justi-

fied in making a warrantless entry into the apartment of defendant Cox.[1]

The order of the District Court is vacated in part and affirmed in part.

1. We observe, however, that not only did the officers not know whether the owner of the car was an occupant of the apartment (in fact he was not), but they also did not even know whether anyone was in the apartment when they initially sought entry, let alone whether the susspected bank robbers were inside. *Compare, e. g.,* Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), *with* Vance v. State of North Carolina, 432 F.2d 984 (4th Cir. 1970), *and* Dorman v. United States, 140 U.S.

App.D.C. 313, 435 F.2d 385 (1970) (en banc). That the door of the apartment was hesitantly opened after an hour's seige and was then partially shut again would not supply the requisite cause for entry, *see* Wong Sun v. United States, 371 U.S. 471, 482–484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Neither would, of course, the fact that an officer saw more than one Negro male inside the apartment, which is located in a Negro section of the city.