**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lawrence F. BECKER, Defendant-Appellant.**

**No. 73–1208.**

United States Court of Appeals, Sixth Circuit.

Argued June 14, 1973.

Decided Oct. 5, 1973.

**52**

David Kerwin, Detroit, Mich., for defendant-appellant; Neil H. Fink, Detroit, Mich., on brief.

Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee; Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., on brief.

Before WEICK, McCREE and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

This appeal is from a conviction for violation of 21 U.S.C. § 841(a)(1), possession of controlled substances with intent to distribute or dispense. Appellant waived trial by jury and the case was tried before the Court with the same judge presiding who conducted the hearing on a motion to suppress evidence. On appeal it is claimed that evidence consisting of 1,000 L.S.D. tablets was illegally seized and should have been suppressed by the district judge.

A recital of the facts is necessary. An undercover agent purchased a quantity of mescaline at a motel in Detroit at approximately 10:00 p. m. on March 3, 1972. He told the seller that he would be interested in purchasing more drugs, and memorized the telephone number given to the motel operator as the seller contacted his "man." The seller was heard to say to someone he called "Larry" that he needed 30,000 more "hits" of mescaline and would be over in 30 minutes to pick it up. The seller described "Larry" as the number two man in Detroit for mescaline.

Shortly thereafter narcotics agents arrested everyone in the motel room where the sale had taken place. The undercover agent passed the telephone number to the arresting officers who verified it with the motel operator. By the time the location and name of the subscriber to the telephone number had been ascertained it was about 11:30 p. m. Based on information received from the tele-

phone company a group of approximately eight agents went to appellant's residence in Oak Park, Michigan, arriving shortly after midnight. After knocking on the door and identifying themselves, the agents forcibly entered Becker's apartment.

Appellant was sitting on a couch in the living-dining room area of his apartment watching television. He was directed to stand next to a wall with his hands up against it. This location was approximately 12 feet from the corner of the couch where Becker was first seen, and was the nearest wall space free of furniture or openings. The arresting agent testified that he had no handcuffs and finally secured Becker with a belt. He stated that appellant kept turning around and "wasn't being real cooperative." Some four or five minutes elapsed before the prisoner was secured. Another agent who was in the same room said that Becker refused to follow orders—that he continued to turn around, kept his hands down instead of up and was constantly moving in a direction other than where he was told to remain. He described appellant's conduct as "resisting" and said it was almost five minutes before the resistance ended.

There was a desk-type table three to five feet from where appellant was standing and the L.S.D. tablets were found in one of its drawers which had been closed. The agent who discovered the drugs stated, "There was a time when I secured the chest to make sure there were no weapons." He said that when Becker had been subdued the other agent searched the prisoner while he checked the surrounding area for weapons. This witness testified that he had put his gun away before he began his search for weapons and that he was "no longer threatened by the situation." However, since Becker had not been tied with the belt at that time, he considered that there was "still a potential danger." It was admitted that Becker never tried to use physical force on any agent. In response to a question by Judge Kennedy the agent who subdued Becker stated that he was searching him when the pills were found and that he did not believe he had put the belt on appellant's arms at that time. The agents stayed in the house for approximately 30 minutes and a general search of the premises was conducted.

The agents who arrested appellant and seized the tablets and other items in his home had neither a search warrant nor a warrant for his arrest. It was testified that the purpose in entering the premises of Becker was to arrest him and there was no advance discussion about a search. Before entering the house, each agent was assigned an area of the premises with responsibility for making sure that no other persons were present and to look for weapons within reach. Appellant testified that from the time the agents entered there was a great deal of noise from all parts of the apartment which indicated that a search was being conducted. He said he kept turning from the wall to try to see what was going on. The agent in charge stated that it would have taken too much time to obtain an arrest warrant at midnight in view of the fact that the seller had informed Becker over the telephone that he would pick up the order of drugs in about 30 minutes. From the telephone conversation the agents believed a crime was being committed by "Larry," the person who agreed to furnish drugs, and that probable cause existed for an arrest.

The foregoing evidence was developed on a motion to suppress all evidence seized in Becker's apartment. The District Court made the following findings: (1) The officers announced their presence and purpose a reasonable time before entering the premises. (2) The search of the chest three to five feet from the appellant was permitted as a search of the immediate area incident to arrest. Such a search could include closed drawers into which Becker could reach for either a weapon or evidence

which he might be able to destroy. (3) Items seized in other parts of the house resulted from a general search which was not permissible. All evidence taken from other areas of the apartment was suppressed. (4) There was no prior opportunity to secure an arrest warrant, but probable cause did exist for the arrest of Becker. (5) The purpose of the officers' going to Becker's residence was to arrest him, and his arrest was not a ruse to search the premises.

■ Appellant maintains that his Fourth Amendment rights were violated by both the forcible entry and arrest without a warrant and the warrantless search of his home and seizure of his property. The record contains evidence which supports the finding of the district judge that there was no prior opportunity under the circumstances of this case for the officers to obtain an arrest warrant in view of the indication from the motel that the drugs would be picked up in about 30 minutes and the fact that it took longer than that just to determine the location and identity of the subscriber to the telephone with which the seller was connected. The finding that identification and purpose were announced a reasonable time before entry was made into appellant's premises is likewise supported by the evidence.

■■ While the finding that the officers had as their purpose the arrest of Becker, and that the arrest was not a mere ruse to conduct a search is not clearly erroneous, this matter deserves comment. The Constitution contemplates that searches will be made upon the basis of a prior determination of necessity by a disinterested magistrate. McDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The warrantless search remains the exception which must be justified. Where the justification relied upon is that the search is a necessary incident to a lawful arrest the restricted scope of this exception must be observed. This is especially true where

the search is conducted in a person's home at night. Such warrants issued pursuant to Rule 41, Fed.R.Crim.P. are subject to the following limitation:

> The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time. Fed.R. Crim.P. Rule 41(c).

Since a nighttime search with a warrant requires more positive information than one conducted in the daytime, the Courts should be alert to prevent evasion of this requirement by resort to warrantless nighttime searches incident to arrest where the real purpose is a search and the arrest is only a pretext.

■ In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court analyzed the extent of the "search incident to arrest" principle as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. *Id.,* at 762–763, 89 S.Ct. at 2040.

We must test the search of a closed drawer in the desk or table which was located three to five feet from appellant by these criteria. The question to be answered is whether, under the circumstances described by the witnesses, the closed drawer was in the area "from within which he might gain possession of a weapon or destructible evidence." *Id.,* at 763, 89 S.Ct. at 2040.

In United States v. Shye, 473 F.2d 1061 (6th Cir. 1973), we held that the District Court properly suppressed evidence consisting of a sack of money found between a water heater and an adjoining wall about four feet from where a suspect was positioned against a wall for search. There was a hallway between the suspect and the water heater which was in a closet-like depression in the wall. Furthermore a policeman stood between this closet and the nearest defendant. All suspects were lined up against a wall and "the officers had the situation completely under control." *Id.,* at 1063. Under these circumstances the District Court properly held that the sack of money was not within the immediate control of the suspects.

In the present case, the situation was not completely under control, since the appellant was still resisting and trying to move in directions other than those prescribed by the officers. He had not been handcuffed or bound when the pills were discovered and the officer who opened the drawer stated that his purpose was to secure the desk to make sure there were no weapons. Insofar as the record discloses no officer was positioned between appellant and the desk until Officer Mahon moved to the desk to look for weapons. Each case which applies the *Chimel* rule must be decided on its own facts. The facts distinguish this case from United States v. Shye, *supra,* and support the finding of the District Court that the evidence in question was the product of a search in the immediate area under the control of appellant at the time of his arrest.

The judgment of the District Court is affirmed.

McCREE, Circuit Judge (dissenting).

I respectfully dissent for two reasons, either of which requires the suppression of the evidence seized in Becker's apartment.

In the first instance, the district court's finding that the primary purpose of the entry into Becker's home at the time of his arrest was not a ruse to permit an exploratory search of the premises is clearly erroneous. The majority opinion characterizes this determination as a finding not clearly erroneous but acknowledges that it deserves comment. The district court justified the holding on the ground that "[i]t was imperative that the arrest be made as quickly as possible if the identity of the party at the other end of JACOBONI'S telephone conversation was to ever be established with sufficient certainty." Apart from the fact that it was not established that there was anyone at the other end of Jacoboni's telephone conversation, the district court's reason indicates the heuristic nature of the enterprise.

Although the finding is fully supported by the testimony of agent Finnegan, the last witness at the suppression hearing who testified on June 28, 1972, it is contradicted by the testimony of the other agents who testified earlier on May 22 and whose testimony is not expressly

discredited by the district court.[1] Also, the organization and deployment of the raiding party betrays the true nature and purpose of the expedition.

Special Agent Herbert Ray, who was designated as custodian of any seized evidence, upon being asked whether there was any discussion "as to how the search was to be conducted," replied, "When I got there my senior partner told me we're going out to the address that Stepp found out about in the conversation—there are supposed to be 30,000 hits there and we're going there to find out. That's what I was told when I got in."

The line of questioning continued, "You were going out there to find out?" He replied, "Yes." The district court did not comment on this admission or explain why it was ignored or discredited.

But more fundamental to our inquiry is the manner in which the raid was organized. A party of 8 to 10 agents was dispatched to arrest the person in whose name the telephone at the number Jacoboni called was registered. The address was an apartment in one of Detroit's northern suburbs. After a meeting in the Federal Building in downtown Detroit where various duties were assigned by Special Agent McKinnon, the agents, in four vehicles, rendezvoused at a gas station near Becker's home where an additional 10 or 15 minutes were devoted to last minute preparations. Despite agent Finnegan's denial that there was to be a search (in contradiction of agent Ray's testimony a month earlier), an advance party was sent to scout the area and agents were stationed at the front and rear doors of the house. Agent Ray was assigned to cover the back door and, instead of being instructed merely to secure it so that no one could escape, he was told ". . . to enter when we got the word from the people that had gone in the front door."

Ray testified that after entering the apartment, he remained about 25 to 30 minutes and "[l]ooked around, looked in closets, looked behind doors, looked between those blankets around the bed and talked with other agents. I talked with Mr. Becker a few minutes." He admitted that he removed books from shelves and saw a table overturned. Indicative of the honesty of his admission that the purpose of the sortie was to effect a search was his volunteered statement when he acknowledged that he went upstairs, "I always manage to get around the rooms when I go in on an arrest."

More significant is agent Ray's statement that he had been on the premises 5 to 8 minutes before the L.S.D. was seized (agent Mahon estimated the interval as between 5 and 15 minutes). If the sole purpose of the entry was to arrest Becker, the agents could have removed him from the house and they would have been miles away on the journey back to the Federal Building before this seizure. Becker could just as easily have been escorted out the door when agent Finnegan "grabbed him by the arm and directed him over to the wall to put his hands up against the wall to be patted down and searched for any weapons." This maneuver positioned Becker spread-eagled against the kitchen wall and Finnegan searched him and found no weapons. The officers were so sufficiently satisfied that Becker was secured that they put away their firearms and fanned out throughout the house in what can only be characterized as a general search. Small wonder that Becker kept turning around to inquire whether the officers had a warrant. To seize on his constitutional query as evidence that he had not been secured in order to justify the search of the closed drawer of the desk 3 to 5 feet away placed Becker in an impossible dilemma. Unless he submitted to the unconstitutional search of his house, he invited the finding that he was endangering the officers and

---

1. It appears that the other agents were excluded from the courtroom until their testimony was given but agent Finnegan had an opportunity to know what had been stated a month before he was required to give his version of events.

thereby justified the search the validity of which he sought to ascertain.

Chief Judge Cecil spoke for this court about arrests used as pretexts for searches in United States v. Harris, 321 F.2d 739 (1963):

> An arrest may not be used as a pretext or subterfuge for making a search of premises without a search warrant where ordinarily one would be required under the Fourth Amendment. If, in fact, the primary purpose of forcibly entering a person's home is to search for evidence with which to convict him of crime, the evidence so obtained is not admissible in court. United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L. Ed. 877; Harris v. United States, 331 U.S. 145, 153, 67 S.Ct. 1098, 91 L.Ed. 1399; Abel v. United States, 362 U.S. 217, 225–226, 80 S.Ct. 683, 4 L.Ed.2d 668; Jones v. United States, 357 U.S. 493, 500, 78 S.Ct. 1253, 2 L.Ed.2d 1514; Worthington v. United States, 166 F.2d 557, 566, C.A.6; Taglavore v. United States, 291 F.2d 262, 265, C.A.9. See also Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Henderson v. United States, 12 F.2d 528, CA.4; Ker v. California, 374 U.S. 23, 83 S. Ct. 1623, 1635, 10 L.Ed.2d 726 (footnote omitted).

In *Harris*, a case with strikingly similar aspects, we made it clear that the total circumstances must be considered in determining the real purpose of the officers.

> All of the agents of the Narcotics Bureau who testified said that they went out to the defendant's apartment for the purpose of arresting him for violating the narcotics laws. The real purpose of the agents must be determined from all of the facts and circumstances surrounding the arrest of the defendant and the search of his apartment. The court is not bound to accept the purpose as stated by the agents as controlling.

> *  *  *  *  *  *

> The manner of placing the agents at the entrances and the way Mr. DeBiasi signalled the men at the bed room door to enter as he gained entrance and knew the defendant was just inside the door is inconsistent with a primary purpose of arrest. If arrest had been the primary purpose of the agents in going to the apartment, there would have been no necessity for the three agents to forcibly enter the bed room door. If they had been placed there to prevent the defendant's escape through that door, certainly they could have caught him on the way out.

*Id.* at 741–742.

Of course, *Harris* was a case in which the trial judge had made a finding that the arrest of the defendant was but a pretext for a search, and here the trial judge found to the contrary. Nevertheless, that decision is instructive of the elements of an arrest used as a pretext for a search and it is apparent that the district court here did not consider them.

We have assumed in the past that the clearly erroneous standard of review applies to findings in a criminal case by a district judge considering motions to suppress evidence. United States v. Rose, 415 F.2d 742 (6th Cir. 1969), cert. denied, 396 U.S. 971, 90 S.Ct. 458, 24 L. Ed.2d 438 (1970), and in United States v. Breen, 419 F.2d 806 (6th Cir. 1969), we expressly stated that Fed.R.Civ.P. 52(a) sets forth the standard of review. *See also,* 2 C. Wright, Federal Practice and Procedure: Criminal § 375. We need not decide here the applicability of this standard because it is clear that the district judge merely accepted the testimony of one of the government agents, disregarded without explanation the conflicting testimony of the others, and did not consider at all the undisputed evidence of the physical disposition and assignment of the several agents as *Harris, supra,* requires. Accordingly, we are not bound to accept the findings of

the district judge, as Chief Judge Hastings, dissenting in United States v. Ziemer, 291 F.2d 100, 103 (7th Cir.), cert. denied, 368 U.S. 877, 82 S.Ct. 120, 7 L.Ed.2d 78 (1961), explained:

> The issue is whether the Government's evidence, taken at its full value, is sufficient to support the constitutional and legal conclusion that defendant consented to a search. Mr. Justice Frankfurter, dissenting in Davis v. United States, 1946, 328 U.S. 582, 599, 66 S.Ct. 1256, 1264, 90 L.Ed. 1453, noted:

>> "The district court's finding that Davis voluntarily surrendered the documents is not one of those findings of facts which appropriately calls for our acceptance. When such a finding involves conflicting evidence or the crediblity of a witness, the advantage of having seen or heard a witness may be decisive. But here the issue is not as to what took place but as to the significance of what took place. And when a district court's finding of a so-called fact is as interwoven as it is here with constitutional consequences, we cannot accept a finding whereby the constitutional issue is predetermined. We are not bound by findings that operate as cryptic constitutional determinations * * *."

The district court suppressed the items seized on the second floor although the search had commenced there before the L.S.D. tablets were found in the living room desk drawer. This conclusion, with which I agree, also required suppression of the tablets taken from the living room in the absence of a finding disassociating the purpose of the agents in the living room who reduced Becker to custody from that of the agents who went upstairs and unlawfully searched the closets and the bed clothes. The coordinated nature of the enterprise precludes such a finding and none was made. It is inescapable that the primary purpose of the agents from the beginning was not to effect an arrest but to conduct a general exploratory search that had not been authorized by a warrant. See Giacalone v. Lucas, 445 F.2d 1238, 1255–1258 (6th Cir. 1971) (McCree, J., dissenting).

But even if the primary purpose of the officers was not to conduct a search but to effect the arrest, the search was constitutionally impermissible. In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Court emphasized that warrantless searches, whether or not incident to arrest, were the exception, not the rule, and that only the exigencies of preventing harm to the arresting officers, the escape of suspects, or the destruction of evidence justified search of the arrestee's person and of the area within his immediate control. In United States v. Shye, 473 F.2d 1061, 1066 (6th Cir. 1973), we observed that only the existence of circumstances at which this limited exception was aimed determined the propriety of invoking it.

In this appeal, Becker had been searched and disarmed, and the officers felt sufficiently secure to put away their weapons. There were 8 to 10 armed agents in the house. Becker's only activity after their entry was to turn away from the wall to inquire about the existence of a search warrant.

Agent Ray testified that when he first saw Becker (about 5 minutes before the L.S.D. was found), "He was secured. There were agents with him and I thought safe at that point." He testified that none of the other agents had his sidearm drawn when he went in and that he put his away. He concluded his direct testimony by reiterating his statement that Becker had been secured when he entered.

Agent Mahon, the other agent to testify at the May 22 hearing of the motion to suppress, found the L.S.D. in the desk drawer. He testified that Becker was "neutralized" within a half minute after

he had been moved to the wall where he was searched. He testified, "I would think after a while once it was finally determined there was no threat of physical harm, the weapons were put away." Upon being asked by the assistant United States Attorney what he meant by "subdued", Mahon replied, "What I mean is he was no longer in a violent nature or position to pull a gun or anything." Mahon's testimony makes it clear that he no longer apprehended any danger when he searched the chest:

Q. When was it that you located something in a chest, a chest drawer in time relation to when he was finally subdued and the belt was on and he was searched?

A. As soon as I was reasonably sure that there was no need for my immediate attention to make sure he wasn't going to be striking out, and I think it was more or less simultaneous upon his being searched that I checked the surrounding area for weapons.

The two officers who testified when the hearing resumed on June 28 added little except to observe that Becker's arms had not yet been bound by a belt at the time the search of the desk took place. The district court's finding that he "had not yet been patted down" is contrary to the testimony of all the officers who testified.

Applying *Chimel's* rationale to these facts, we must conclude that the opening of the desk drawer was impermissible. As the majority opinion quotes, *Chimel* makes a distinction between a gun on a table or in a drawer in front of one who is arrested and desk drawers and closed areas in the room in which the arrest is made.

Because I would reverse for either of the reasons stated, I find it unnecessary to consider whether probable cause existed for the arrest of a telephone subscriber when an officer overheard the dialing of his number by a criminal who stated into the transmitter that he would be over to pick up some narcotics. I also find it unnecessary to determine whether the forcible entry into a dwelling house in the night time to effect a warrantless arrest can be made in the absence of exigent circumstances and a showing of probable cause that the person to be arrested is at the entered address. I also find it unnecessary to determine whether the entry here was made so precipitously after the announcement of the presence of the officers and their purpose as to constitute non-compliance with the requirement in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1967) that there must be a showing of refusal of admittance of the officer before a door may be forced. I mention these issues only to indicate that they are substantial and should be considered if the conviction is to be affirmed.

I recognize that this is a case where a search proved to be phenomenally productive. The prevention of the distribution of 1843 tablets of lysergic acid diethylamide (L.S.D.) is a fortunate occurrence for any community and the impulse to uphold the search and to congratulate the officers is difficult to resist. Nevertheless, however fortuitously rewarding a search may prove to be, we cannot abandon our responsibility as guardians of the Grail and blink at the circumvention of constitutional limitations by overzealous police officers. I would reverse and remand with instructions to quash the search and to set aside the conviction.