Commonwealth *v.* Guyton, Appellant.

Submitted March 28, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Thomas C. Branca* and *John W. Packel,* Assistant Defenders, and *Vincent J. Ziccardi,* Defender, for appellant.

*David Richman, John H. Isom, Mark Sendrow,* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee.

OPINION BY JACOBS, J., September 23, 1974:

In this appeal, appellant challenges the admission into evidence of a gun and certain money seized by police and the identification made of him by the victim of the crime. Although the court below may have erred in denying appellant's motion to suppress such evidence, that error was at most harmless.

After the Commonwealth presented its case which included the introduction of the aforementioned evidence, appellant took the stand in spite of warnings by the lower court that he had a right not to take the stand and anything he said could and would be used against him. On direct examination, appellant testified that the victim's testimony at trial was inconsistent with her testimony at the preliminary hearing and also that he was arrested by a police officer other than the one who said he arrested appellant. On cross-examination, however, appellant admitted being at the scene of the crime with the gun in his pocket and leaving with a paper bag which the victim had filled with money. Under such circumstances, these admissions by appellant cured any alleged error by the court below in denying the motion to suppress the gun, the money, and the identifications. See *Young v. Maryland,* 455 F.2d 679 (4th Cir. 1972), *cert. denied,* 407 U.S. 915 (1972) (admission of supposedly illegally seized trench coat containing sperm stains held harmless error since defendant took stand and admitted wearing coat while having intercourse with rape victim); *United States v. Smith,* 450 F.2d 312 (3d Cir. 1971), *cert. denied,* 405 U.S. 932 (1972) (admission of tainted identification held harmless error since defendant took stand and admitted being in car with victim); *Gladden v. Frazier,* 388 F.2d 777 (9th Cir. 1968), *aff'd,* 394 U.S. 731 (1969) (admission of bloodstained clothes claimed to be illegally seized held harmless error since defendant took stand and testified as to affray and getting blood on his clothes); see also *Commonwealth v. Greene,* 456 Pa. 195, 317 A.2d 268 (1974).

Appellant argues that his testimony should not be permitted to cure the pre-trial rulings on the alleged illegal evidence because the introduction of such evidence entitled him to take the stand to offset the resulting prejudice. For authority, appellant cites *Unit-*

ed States v. Puco, 453 F.2d 539 (2d Cir. 1971), cert. denied, 414 U.S. 844 (1973), which we find to be distinguishable. In Puco, the lower court prior to trial erroneously ruled that defendant's prior conviction could be used to impeach him. When defendant took the stand he was questioned on direct by his counsel regarding his prior conviction. The court held that defendant's own reference to his prior conviction did not preclude his right to attack the lower court's earlier ruling because he was entitled on direct to offset the prejudicial effect of that ruling. In the present case, the evidence in question was admitted during the Commonwealth's case. Appellant then took the stand and in no way attempted on direct to explain away or offset the effect of the introduction of that evidence. It was only on cross-examination that counsel for the Commonwealth extracted the damaging admissions from appellant that he was at the scene of the crime with a gun and ran off with the bag full of money.[1] It is clear that appellant did not take the stand for the purpose of offsetting the prejudice he earlier encountered.[2] Having taken the stand, appellant subjected himself to the risks of cross-examination. See Commonwealth v. Camm, 443 Pa. 253, 277 A.2d 325 (1971), cert. denied, 405 U.S. 1046 (1972).

Appellant also complains that he did not intelligently and knowingly waive his right to a jury trial

---

[1] Although the scope of cross-examination was objected to at trial, appellant has not raised that issue on this appeal.

[2] In Harrison v. United States, 392 U.S. 219 (1968), defendant took the stand to explain away the illegally obtained confession that had been introduced into evidence by the prosecution. There, the United States Supreme Court found, as did the court in United States v. Puco, 453 F.2d 539 (2d Cir. 1971), cert. denied, 414 U.S. 844 (1973), that the admissions were impelled by the prior erroneous ruling. However, unlike Harrison and Puco, the admissions in the present case were elicited on cross-examination, and, thus, obtained by methods purged of any possible prior illegality.

because he answered "yes" when asked if there was any promise being made for his waiver. However, the record reflects that when the court asked appellant about the promise, defense counsel immediately stated that no promise was made, but that appellant merely meant that he understood that no promise could be made. Appellant remained silent while his counsel made this explanation, and we are satisfied from this state of the record that appellant's waiver was voluntary and intelligent.

Judgment affirmed.

———

DISSENTING OPINION BY HOFFMAN, J.:

In affirming a criminal conviction, the Majority in its Opinion, frames the issue presented on appeal as follows: "In this appeal, appellant challenges the admission into evidence of a gun and certain money seized by police and the identification made of him by the victim of the crime. *Although the court below may have erred in denying appellant's motion to suppress such evidence,* that error was at most harmless." (Emphasis added). Without discussing the issues raised by the appellant concerning the warrantless search of an entire house incident to the arrest of the wrong man, this Court justifies the possible error of admitting the physical evidence by alerting us that the defendant took the stand and testified to possessing the seized items under exculpatory circumstances. I must strenuously dissent from this "correction" of error by hindsight.

On May 2, 1972, a robbery occurred at the Upsal Cleaners, 5900 Greene Street in Philadelphia. At about 4:00 p.m., responding to a radio call, Officer Certain proceeded to the scene where he saw an unidentified Negro male within a half block of the business establishment. Officer Certain, relaying the broadcast description, asked the individual if he had seen "a Negro male, about 145 pounds, dark complexion, wearing a

tan fish type hat, blue tee shirt and light pair of pants." The man told Officer Certain that he saw a man fitting that description run into 157 West Price Street, about a block from the scene of the robbery. Joined by two other officers, Officer Certain went to 157 West Price Street, knocked on the door and stated that he and his fellow officers were looking for a robbery suspect. Without giving the girl who had responded to the knock an opportunity to permit entry into the premises, the officers "just walked in without anybody inviting [them]."

As they entered, the officers observed a Negro male having "a hat and shirt on just like the suspect had on . . . ," and promptly arrested him. They then proceeded, without a warrant, to ascend the stairs to the second floor in an effort to find the contraband.[1] In one of the bedrooms, police found a gun, a blue tee shirt, a brown fish type hat, a brown paper bag and money scattered all over the bed. At this point, the police left the premises and took the suspect, the woman and the seized items back to the robbery victim, who identified the items but could not identify the man as the robber because he was "a lot taller."

Police then returned to 157 West Price Street and re-entered the door which they had left ajar. They searched the entire residence again and found the appellant under a bed. Police returned to the scene and this time the complainant identified the appellant as the robber.

Appellant was charged with burglary, aggravated robbery, playfully pointing and discharging a deadly

---

[1] During the trial, Officer Certain was asked on cross-examination: "Q. Well, then after you had him in custody and after you had the girl, she couldn't go anywhere, why did you go upstairs? A. Why did we go upstairs? To continue the search. Q. For what? A. For this. For the things. Q. What things? A. The gun. The money."

weapon, and carrying a concealed deadly weapon, carrying firearms without a license and carrying firearms on a public street or public place. Appellant's pre-trial motions to suppress were denied. Thereafter, he was tried before the Honorable Joseph L. McGLYNN, Jr., sitting without a jury, and convicted on all charges. After an appeal to, and remand by this Court, post-trial motions were argued nunc pro tunc and denied. This appeal followed.

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their person, home, papers and effects by providing that searches shall not be conducted ". . . but upon probable cause, supported by oath or affirmation." These guarantees have been held to be applicable to the States by virtue of the Fourteenth Amendment's due process clause. *Mapp v. Ohio,* 367 U.S. 643 (1961). In all but a narrowly circumscribed area of "exceptional circumstances", police must obtain a search warrant prior to a search of a person or his property. Any warrantless search not within these well-delineated exceptions is per se unreasonable under the Fourth Amendment. *Coolidge v. New Hampshire,* 403 U.S. 443 (1971).

Where there is no probable cause to arrest, police have a right under appropriate circumstances to stop and interview a person for purposes of investigation. In such a situation, officers may search the person and the immediate vicinity within that person's reach for weapons where the officers have reason to believe their safety is endangered. *Terry v. Ohio,* 392 U.S. 1 (1968); *Sibron v. New York,* 392 U.S. 40 (1968). This has always been a strictly limited right.

When a search is made incident to an arrest, two factors must coexist to justify the warrantless search: (1) the arrest must be valid under the authority given to the arresting officer; and, (2) there must have been

"probable cause" to arrest. *Sibron v. New York*, supra; *Weeks v. United States*, 232 U.S. 383 (1914). While, in many circumstances probable cause to arrest also means probable cause to search the arrested suspect, it must be remembered that in *any* search there must be probable cause to believe that either weapons, contraband or fruits of a particular crime exist. As the United States Supreme Court said in *Trupiano v. United States*, 334 U.S. 699, 708, 68 S. Ct. 1229, 1234 (1948) : "A search or seizure without a warrant as an incident to a lawful arrest has always been considered to be a strictly limited right . . . . But there must be something more in the way of necessity than merely a lawful arrest. The mere fact that there is a valid arrest does not ipso facto legalize a search or seizure without a warrant . . . . Otherwise the exception swallows the general principle, making a search warrant completely unnecessary wherever there is a lawful arrest." *Cf., United States v. Robinson*, 414 U.S. 218 (1973).

In the instant case, a police officer on patrol received a radio message that a robbery had taken place at a nearby business establishment. He received a detailed description of the alleged robber and upon coming on the scene was informed by a passer-by that he had seen a person fitting that description running into a house less than a block away from the scene. At this point, Officer Certain had a strong reason to believe that the suspect had entered 157 West Price Street. The record shows that the police announced their purpose upon knocking at the door, but did not wait very long to allow the female voice to admit the police. This, of course, is repugnant to established precedent which frowns upon the invasion of an individual's dignity and privacy without giving the occupant "a reasonable opportunity to surrender his privacy voluntarily." *Commonwealth v. DeMichel*, 442 Pa. 553, 561, 277 A. 2d 159 (1971) ; *Commonwealth v. Riccardi*, 220 Pa. Superior

Ct. 72, 283 A. 2d 719 (1971). While the abrupt entry of the police may have been an act lacking in discretion and consideration, the facts do not present such a clear abuse of the police power as to fall within that line of cases which hold that an unannounced, nonconsensual entry is violative of the Fourth Amendment. See, e.g., *Commonwealth v. Riccardi,* supra, and cases cited therein.

When the door was opened, police noticed a man fitting the description given by the victim, and immediately arrested him and his wife. Because of the proximity of the residence to the scene, the observations of the unidentified passer-by, and the relatively instantaneous discovery of the alleged suspect following the robbery, police certainly had probable cause to arrest the man they assumed had run into the house from the direction of the scene. The circumstances also warranted a search of the man by police for the gun used in the robbery and any of the stolen money. The question is whether the police were justified in continuing to search the entire house, including the upstairs bedrooms where the gun and money were found.

In *United States v. Robinson,* 414 U.S. 218, 94 S. Ct. 467 (1973), wherein the Supreme Court upheld the conviction of the respondent on whom heroin was found after a search following an arrest for a traffic violation, the Court outlined the scope of a warrantless search incident to an arrest: "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee." 94 S. Ct. at 471.

In holding that a "custodial" arrest, even for a traffic offense, justified the search of the *person* of the accused for "fruits, instrumentalities, or contraband," the Supreme Court was careful to distinguish the case from those where the scope of the search went beyond the limits of reasonableness. The Texas Court of Criminal Appeals has held that *Robinson* authorizes only the search of the person, and does not, in the case of traffic offenses, give license to the authorities to conduct a general search of the offender's automobile absent a warrant supported by "probable cause". *Wilson v. State,* 512 S.W. 2d 242 (1974).

The scope of a valid search incident to an arrest was announced in *Chimel v. California,* 395 U.S. 752, 762-763 (1969), reversing previous decisions by the Supreme Court allowing a broader scope in such cases:[2] "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape . . . . And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule . . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean *the area from within which he might gain possession of a weapon or destructible evidence."* (Emphasis added).

This permissible area of a search incident to the arrest may be extended by "exceptional circumstances" which justify a search beyond the person of the arrestee. Probable cause does not provide exigent circumstances, nor vice versa. ". . . [A] dual inquiry must be made. First, whether there existed probable cause

---

[2] *United States v. Rabinowitz,* 339 U.S. 56 (1950) ; *Harris v. United States,* 331 U.S. 145 (1947).

to search and second, whether exigent circumstances can be found to excuse the obtaining of a warrant." *Commonwealth v. Heard,* 451 Pa. 125, 128, 301 A. 2d 870 (1973).

Once having the suspect in custody and not having any reason to believe that others were involved in the robbery, the police were not justified in conducting a general search of the house without first obtaining a warrant. While they were justified in searching the suspects and searching the area within their "immediate control", and while there may have been probable cause to issue a warrant for the premises "exigent circumstances" did not exist to legalize a general warrantless search of the bedrooms on the second floor. See *Vale v. Louisiana,* 399 U.S. 30 (1970), holding that a warrantless search of arrestee's house where the arrest took place outside the house was not justified. Also, *United States v. Becker,* 485 F. 2d 51 (6th Cir. 1973) (search of desk drawer three to five feet from the spot where man was arrested was valid, but items seized as a result of warrantless search of entire residence suppressed) ; *United States v. Bonds,* 422 F. 2d 660 (8th Cir. 1970) (search of upstairs bedroom not justified where defendant was arrested in his first-floor living room).

After the police realized that they had arrested the wrong man, they returned to the premises and continued a search of the upstairs bedrooms. They found the appellant under a bed. They took the appellant back to the scene whereupon the victim identified the appellant as the robber. The victim had earlier identified the stolen money and the gun found in the house and this fact weighed heavily in both the decision by the police to return to the premises and the victim's subsequent identification of the appellant, who by this time was not wearing the tee shirt or hat described by the victim. "It is axiomatic that an incident search

may not precede an arrest and serve as part of its justification." *Sibron v. New York,* 392 U.S. 40, 63 (1968). After the failure of the victim to identify the man fitting the description, the police could not assume, in the absence of the discovery of the items seized as a result of the general search, that another man was present in the house. Furthermore, it is impossible to say what significance or influence the disclosure by police that they had found the items in the house wherein they later found the appellant had on the victim's ability to identify the appellant as his assailant. While I cannot agree that the identification at the scene shortly after the alleged robbery was in violation of *Stovall v. Denno,* 388 U.S. 293 (1967) and *United States v. Wade,* 388 U.S. 218 (1967), I believe that the identification was improperly tainted by the "poisonous fruit" of the illegal search and seizure. Concluding that the warrantless search was in violation of the Fourth Amendment's guarantee against unreasonable search and seizures, I must likewise hold that any evidence derived therefrom, including the subsequent arrest and identifications of the appellant must be excluded. As the Supreme Court of the United States stated in *Wong Sun v. United States,* 371 U.S. 471, 484-485 (1963): "In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, . . . this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. . . . The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. . . . Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."

I cannot agree with the Majority of this Court that once this illegal evidence was introduced at trial, appellant's testimony attempting to explain his conduct could be held to be anything other than a "fruit" of the unwarranted search and seizure. Without the evidence so obtained, the appellant would not have even been before the Court.

I would reverse the judgment of sentence, vacate the conviction, and order the appellant discharged.

––––––––

DISSENTING OPINION BY SPAETH, J.:

I agree with Judge HOFFMAN that if there was error it was not harmless. I also agree with him that when the police had arrested the first suspect on the first floor they were precluded by *Chimel* from making a general warrantless search of the second floor. However, Judge HOFFMAN states that "[a]fter the failure of the victim to identify [the first suspect], the police could not assume, in the absence of the discovery of the items seized as a result of the general search, that another man was present in the house." I am not so sure. The store was not far away, the robbery not long ago, and the police had some assurance that the robber had run into the house. Even if they had not found the money, gun and clothing on the second floor I suspect they would have gone back to look for another man, once the victim had said they had the wrong man. I should therefore remand for further hearing. If the hearing judge were to conclude that he could not tell what the police would have done, I should agree that the arrest of appellant was bad. But if the judge were to conclude that the police would have gone back, then I should like the benefit of his findings on whether they would have been justified in doing so. I think they might have been, in which case I should suppress the improperly seized money, gun and clothing but order a new trial without that evidence.

CERCONE, J., joins in this opinion.